Lyndon H. LaROUCHE, Jr. and Kevin C. Salisbury and Linda W. Back and Benjamin F. Raney and Barbara L. Brown

v.

Lorraine SHEEHAN, Secretary of State of Maryland.

Civ. No. K–84–675.

United States District Court,
D. Maryland.

June 30, 1984.

Odin P. Anderson, Boston, Mass., Patrick J. Moran, Rockville, Md., and Karl W. Pilger, Washington, D.C., for plaintiffs.

Stephen H. Sachs, Atty. Gen. of Maryland, Susan K. Gauvey and Jack Schwartz, Asst. Attys. Gen. of Maryland, Baltimore, Md., for defendant.

**FRANK A. KAUFMAN, Chief Judge.**

Plaintiffs, Lyndon H. LaRouche, Jr., a candidate for the Democratic presidential nomination, and four of his political supporters, instituted this action against defendant Lorraine Sheehan, Secretary of State of Maryland, seeking placement of Mr. LaRouche's name on the May 8, 1984 Maryland primary election ballot pursuant to Md.Ann.Code art. 33, § 12–6(a)(1) (1983 Repl.Vol.).[1] That provision of the Maryland Code provides, *inter alia,* that the Secretary of State shall place the name of the candidate upon the primary election ballot when in the sole discretion of the Secretary, "the candidate's candidacy is generally advocated or recognized in the news media throughout the United States or in Maryland...."

In February, 1984, defendant Sheehan determined that the names of eight Democratic presidential candidates should be placed on the Maryland primary ballot pursuant to section 12–6(a)(1).[2] Defendant Sheehan did not place the name of Lyndon LaRouche on the primary ballot, as she found that "Mr. LaRouche's candidacy is not generally advocated or recognized in the news media throughout the United States or in Maryland."[3] Thereafter, on February 24, 1984, plaintiffs instituted the within case seeking immediate and permanent injunctive and declaratory relief.

1. Md.Ann.Code art. 33, § 12–6(a)(1) (1983 Repl. Vol.) provides in full:

   **§ 12–6. Primary election for candidate for President and delegates to national convention.**

   (a) *Manner of becoming candidate for nomination for President.*—Whenever a party uses a primary election to nominate a candidate for President of the United States, any person who desires to run in the primary election may become a candidate for nomination only:

   (1) By direction of the Secretary of State who shall place the name of the candidate upon the ballot no sooner than 90 days nor later than 70 days preceding the date set by law for the primary election when he has determined in his sole discretion that the candidate's candidacy is generally advocated or recognized in the news media throughout the United States or in Maryland, in accordance with the national party rules, unless the candidate executes and files with the Secretary of State an affidavit stating without qualification that he is and does not intend to become a candidate for the office in the Maryland primary election;
   ....

2. The eight Democratic candidates who Secretary Sheehan determined as "generally advocated or recognized" in the national or local news media were: Walter Mondale, John Glenn, Gary Hart, Alan Cranston, Reuben Askew, George McGovern, Jesse Jackson and Ernest Hollings.

3. *See* Draft Joint Stipulations of Facts, No. 3.

Plaintiffs allege that defendant's refusal to place Mr. LaRouche's name on the ballot was arbitrary and illegal and that, in any event, section 12–6(a)(1) is void for vagueness.

On February 27, 1984, several days after plaintiffs initiated this action, plaintiff LaRouche did obtain placement on the Maryland primary ballot by virtue of the *petition* provisions of Md.Ann.Code art. 33, § 12–6(a)(2) (1983 Repl.Vol.).[4] The petition provisions of section 12–6(a)(2) provide an alternative means of gaining access to the Maryland primary election ballot. Thus, under the Maryland election code, a person seeking the presidential nomination may become a candidate on the Maryland primary ballot by either submitting the requisite number of signatures via the petition route or by being placed on the ballot at the direction of the Secretary of State under the media recognition provision.

■ Despite the fact that plaintiff LaRouche did obtain placement on the Maryland primary election ballot by way of petition, plaintiffs continue to press their claims that section 12–6(a)(1) is unconstitutionally vague or, in the alternative, that the statute was arbitrarily applied to Mr. LaRouche's candidacy. Because the issue of the constitutionality of the statute presents a legal question not rendered moot by Mr. LaRouche's placement on the ballot, this Court will reach and determine herein the merits of the first of those two questions. *See, e.g., Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8,

39 L.Ed.2d 714 (1974): "The 1972 election is long over, and no effective relief can be provided to the candidates or voters, but this case is not moot, since the issues properly presented, and their effects on independent candidacies, will persist as the California statutes are applied in future elections."[5] As to plaintiffs' second or "as applied" claim, the question of whether the placement of Mr. LaRouche's name on the ballot renders it moot need not be addressed herein.[6] This Court is foreclosed from entertaining such a claim under *Pennhurst State School and Hospital v. Halderman,* —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), in which the Supreme Court held that the Eleventh Amendment bars a federal court from ordering a state official to conform his conduct to state law. Accordingly, the single remaining issue herein relates to the facial validity of section 12–6(a)(1).

Plaintiffs claim that section 12–6(a)(1) is void for vagueness because it is standardless and places unbridled discretion in the Secretary of State, and that that section also violates the equal protection clause because it unduly restricts the exercise of fundamental First Amendment rights.

### Void for Vagueness

■ The void-for-vagueness doctrine, while originally adopted in the context of penal statutes, has been applied to statutes which deter a "substantial amount of conduct" protected by the First Amendment. *See Kolender v. Lawson,* 461 U.S. 352,

---

**4.** Section 12–6(a)(2) states:

(2) By making the payment required and by filing with the State Administrative Board of Election Laws, a petition in the form prescribed by the State Administrative Board of Election Laws which shall contain the signatures of not less than 400 of the registered voters within each congressional district, at least 70 days preceding the date set by law for the primary election. Nothing in this section shall require compliance with § 7–1.

**5.** *See also American Party of Texas v. White,* 415 U.S. 767, 770 n. 1, 94 S.Ct. 1296, 1301, n. 1, 39 L.Ed.2d 744 (1974); *Rosario v. Rockefeller,* 410 U.S. 752, 756 n. 5, 93 S.Ct. 1245, 1249 n. 5, 36 L.Ed.2d 1 (1973).

**6.** While several Supreme Court decisions indicate that "as applied" election challenges are not rendered moot by an intervening election because of the "capable of repetition yet evading review" doctrine, *Storer v. Brown, supra,* 415 U.S. at 737 n. 8, 94 S.Ct. at 1282 n. 8, defendant nevertheless contends that the within "as applied" challenge is moot because the same facts will not reoccur in terms of a candidate's degree of media recognition in subsequent elections. In other words, defendant contends that the election law will *not* be applied identically in the future, because a candidate's degree of media recognition will vary. Those contentions need not be determined herein because of the effect of *Pennhurst.*

**920**

358, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903, 910 n. 8 (1983); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). A statute is unconstitutionally vague if persons of "common intelligence must necessarily guess at its meaning and differ as to its application," *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), or if it "fails to give a person of ordinary intelligence fair notice" of conduct proscribed or required by the statute, *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954), and "encourages arbitrary and erratic" behavior on the part of those officials charged with enforcing the statute, *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). In that vein, Justice Marshall has written:

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford,* 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972) (footnotes omitted), *quoted in Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982).

■ "The degree of vagueness that the Constitution tolerates—as well as the rela-

tive importance of fair notice and fair enforcement—depend in part on the nature of the enactment." *Flipside, supra,* 455 U.S. at 498, 102 S.Ct. at 1193. Thus, courts are more tolerant of possible vagueness in connection with laws which impose civil, rather than criminal penalties "because the consequences of imprecision are qualitatively less severe." *Flipside, supra,* 455 U.S. at 498-99, 102 S.Ct. at 1193-94. However, a law which interferes with the right of free speech should receive relatively more stringent scrutiny. *Flipside, supra,* 455 U.S. at 499, 102 S.Ct. at 1194.

■ When the constitutionality of a statute is challenged, it is the Court's obligation in determining validity "not to destroy the [statute] if we can ... but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations." *United States Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973). In *Kay v. Austin,* 621 F.2d 809 (6th Cir.1980), the Sixth Circuit examined language in a Michigan election law similar to the Maryland statutory provisions involved in this case.[7] The Michigan election code, like that in Maryland, provided for ballot access either by direction of the Secretary of State or by virtue of a petition procedure. The statutory language at issue in *Austin* stated: "[T]he secretary of state shall issue a list of the individuals generally advocated by the national news media to be potential presidential candidates...." *Id.* at 810. The Court in *Austin* considered the language to be capable of "narrow and reasonable applications" (at 812) and stated:

The word "advocated" cannot be read in isolation from the complete phrase "advocated to be a potential presidential candidate." So read, it does not require endorsement by the national news media, but only that the national news media generally recognize that the individual is

---

**7.** California, Nebraska and Florida all have "media recognition" provisions in their election codes. *See* Calif. Elections Code, § 6311; Ne-

braska Elections Code, § 32–511(2); and Fla. Stat.Ann., § 103.101.

a potentially viable, but not necessarily successful, candidate.

*Id.* at 812.

In *Belluso v. Poythress*, 485 F.Supp. 904 (N.D.Ga.1980), the Court found the challenged statutory language—"a list of names of potential presidential candidates who are generally advocated or recognized in news media throughout the United States" (at 907) to be facially reasonable because "it is not standardless or arbitrary" and because "it does not of necessity operate to exclude from the primary ballot candidates with a constitutional right to inclusion." *Id.* at 913. In addressing plaintiffs' vagueness challenge, the Court wrote:

> The plaintiffs make much of the section's vagueness; its supposed delegation to a single official, the Georgia Secretary of State, of the authority to interpret its meaning; and its allegedly standardless grant of power to exclude even a candidate designated by the Secretary of State to a unanimous trio of party officials. Contrary to these contentions, however, the law does furnish usable guidelines. While Georgia has eschewed the more objective approach taken by states that have imposed filing fees and petition requirements, it has sought a principled means of evaluating a candidate's seriousness, on the theory that his or her recognition in the media demonstrates a minimum degree of public support. Georgia's test may not be the most desirable—it is certainly not the most specific—but it is neither irrational nor even unrealistic.

485 F.Supp. at 913. Under the Georgia statute at issue in *Belluso*, there existed no petition alternative as there does under the Maryland Code. Therefore, the Georgia statute, which provided that placement on the ballot by the Secretary of State was the sole means of gaining access to the ballot, would seem to come closer to infringing upon protected First Amendment rights of candidates than does the Maryland statute challenged herein.

In *Kay v. Mills*, 490 F.Supp. 844 (E.D. Ky.1980), the Kentucky election law in question provided:

> [T]he board shall nominate as presidential preference primary candidates all those generally advocated and nationally recognized as candidates of the political parties for the office of President of the United States.

*Id.* at 846. In striking the statute as impermissibly vague, the Court noted that the Kentucky statute did not identify the source or sources of the required recognition. In other words, a candidate was not apprised of whether his candidacy must be advocated and recognized in the news media or elsewhere. In *Mills*, the Court, citing *Kay v. Austin, supra*, indicated that the addition of the phrase "in the news media" would have rendered the Kentucky statute constitutional because "[a]t least the aspiring candidate in Michigan knows from whom he must seek recognition. In this Court's view the Michigan statute marks the borderline of the permissible zone, and the Kentucky statute falls beyond the pale." *Id.* at 854 (footnote omitted). Under that rationale, the Maryland election law passes constitutional muster since it does specify that a candidate will be placed on the ballot when he is "generally advocated or recognized in the news media in Maryland or throughout the United States." In *Mills*, the Court noted that national recognition may be a "valid, rational basis for placing a candidate on a presidential ballot" and that a state agency might appropriately "be vested with the power to decide what candidates have met such a standard." *Id.* at 853. Finally, the Court in *Mills* framed its holding of unconstitutionality narrowly, concluding: "This court holds only that this discretion may not be uncontrolled." *Id.* at 853.

Plaintiffs argue that the Maryland statute in issue herein, *i.e.*, section 12–6(a)(1), impermissibly restricts First Amendment rights to vote and to associate, and thus is subject to a vagueness challenge. To the contrary, defendant maintains that section 12–6(a)(1) does not violate protected First Amendment rights, as the

media recognition provision is designed to "open the ballot to more candidates" rather than to restrict ballot access, and that section 12–6(a)(1) provides Maryland voters with an opportunity to vote for all widely recognized political candidates, regardless of the fact that some candidates may have chosen not to campaign actively in the Maryland primary. Defendant further contends that only section 12–6(a)(2)—the petition provision—is a ballot access restriction, as it alone is designed to insure that frivolous candidates, who fail to evidence any substantial support, are omitted from the ballot. In support of its position, defendant points to the following statement in *Kay v. Austin, supra:*

> Where, as here, the purpose of a statutory provision is to open the ballot to more candidates, the Court should consider the statute in its place in the whole legislative scheme. It does not take away a right or burden any candidate but confers a benefit. *Cf. Kahn v. Shevin,* 416 U.S. 351 [94 S.Ct. 1734, 40 L.Ed.2d 189] (1974). The legislature has the right to determine that the state's electors should have the opportunity to vote for those people whom the national news media have identified as genuine candidates.

Defendant further argues that even if section 12–6(a)(1) can be viewed as a ballot restriction and in any way burdens the exercise of fundamental rights, it does so only marginally. In other words, because of the availability of ballot placement through minimal petition requirements [8]—which plaintiffs easily satisfied here—section 12–6(a)(1) does not unduly infringe upon protected rights.

The issue of whether the media recognition provision inhibits First Amendment rights, and if so, to what degree, is critical to the question of whether defendant can meritoriously advance a facial vagueness challenge. *Kolender v. Lawson, supra* 461 U.S. at —— n. 8, 103 S.Ct. at 1859 n. 8,

75 L.Ed.2d at 910 n. 8. Further, the greater the degree of First Amendment conduct implicated, the greater should be the requirement of specificity in the statute. *Id.* Herein, First Amendment rights are implicated by the challenged statute, but the rights involved are not as "fundamental" as traditional, content-based free speech rights.[9] Further, in light of the petition provisions in section 12–6(a)(2), plaintiffs' First Amendment rights are burdened but not extinguished by section 12–6(a)(1).

In *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), Justice Black observed that ballot access requirements trench upon two constitutionally protected rights—"the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." 393 U.S. at 31, 89 S.Ct. at 10. In *Williams,* Justice Black subjected the challenged Ohio ballot access requirements to strict scrutiny and in so doing, found the Ohio statute constitutionally infirm. That statute established particularly harsh ballot access restrictions for minority parties in presidential elections, mandating that any political party which failed to receive ten percent of the vote in the previous gubernatorial election must file a petition signed by a number of registered voters equal to at least fifteen percent of the votes cast in that election. The parties were required to file their petitions nine months before the election in which they sought to participate and were required to comply with extensive and costly organizational demands. With those restrictions, Ohio virtually excluded minority parties. It was in that context that the Supreme Court identified, without elaborating upon, the two fundamental rights of political association and voting implicated by ballot access restrictions.

Subsequent ballot access cases seemingly have retreated from some of the implica-

---

**8.** Defendant points out that the signatures of less than one-fourth of one percent of the registered voters of Maryland are required under the petition alternative in section 12–6(a)(2).

**9.** Professor Tribe has referred to the first amendment's protection of speech as the "most majestic guarantee." Laurence H. Tribe, *American Constitutional Law,* 576 (1978).

tions in *Williams*. Developments, *Election Law*, 88 Harv.L.Rev. 1111, 1133 (1975). In *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), the Court made only brief mention of the alleged infringements of fundamental rights in examining Georgia's independent candidate qualifying law. There, the Court rejected a challenge to Georgia's regulations which denied ballot access to independent candidates unless they paid a filing fee and filed a petition signed by at least five percent of the number of registered voters in the previous election. Justice Stewart held that "Georgia in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life." *Id.* at 439, 91 S.Ct. at 1975.

Later ballot access cases, although purporting "to subject the access requirements to strict scrutiny, [actually assess] ... the requirements by a far less demanding standard." L. Tribe, *supra* at 783. For example, in *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), plaintiffs challenged a Texas statute which denied ballot position to any political party which neither secured two percent of the vote in the previous election nor filed petitions signed by one percent of the registered voters. In upholding that statute, Justice White acknowledged that the access requirements burdened associational rights, but observed that the requirements served two compelling state interests, namely, preservation of the integrity of the electoral process and avoidance of voter confusion. Similarly, in *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974), Chief Justice Burger deemed the right to appear on a ballot to be constitutionally protected, observing that the right could be burdened, but only by means "reasonably necessary" to limit the field to serious candidates. Recently, in *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982) Justice Rehnquist, writing for the majority of the Court, expressly disavowed the strict scrutiny approach: "Far from recognizing can-

didacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.'" *Id.* at 963, 102 S.Ct. at 2843. Justice Rehnquist also wrote: "Decision in this area of constitutional adjudication is a matter of degree, and involves a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions." *Id.* However, one year later in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), Justice Stevens noted that "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights." *Id.* 460 U.S. at 786, 103 S.Ct. at 1568, 75 L.Ed.2d at 556.

While the above ballot access cases seemingly establish that statutes such as Md.Ann.Code art. 33, § 12–6(a)(1) implicate protected First Amendment rights, those cases also appear to require the conclusion that those First Amendment rights are not of the same stature as traditional free speech rights which have been accorded the highest protection afforded by the Constitution. Indeed, statutes infringing upon traditional, content-based free speech rights have consistently—and rigorously—been evaluated under a strict scrutiny analysis.[10] Thus, the vagueness cases to which plaintiffs cite and which involve traditional First Amendment, content-based free speech rights are not wholly apposite in the ballot access context. Further, those cases are distinguishable on the basis that they involve a total frustration—or prior restraint—of such rights, whereas herein, because of the alternative ballot access provisions set forth in section 12–6(a)(2), there is no complete frustration of First Amendment rights.

Plaintiffs rely upon the Supreme Court cases of *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed. 2d 162 (1969); *Staub v. Baxley*, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958);

10. *See* L. Tribe, *supra* § 12–8 at 602–04.

*Kunz v. New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed.2d 280 (1951); and *Hynes v. Mayor and Council of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976), in support of their contention that a statute which makes enjoyment of First Amendment rights dependent upon the unbridled discretion of a government official is void for vagueness.

In *Shuttlesworth v. City of Birmingham, supra,* Justice Stewart struck down an ordinance which prohibited participation in a parade or demonstration without a permit. The permit could be refused if the officials felt that the parade did not serve the "public welfare, peace, safety, health, decency, good order, morals or convenience." *Id.* at 148. In holding the statute unconstitutional, Justice Stewart observed that the law subjected First Amendment freedoms to prior restraint and conferred "virtually unbridled and absolute power" on the responsible officials to prohibit any parade. *Id.* at 150. The Alabama statute under consideration in *Shuttlesworth* was penal in nature and subjected any violator to a term of imprisonment and a fine. The statute at issue in this case, which requires the Secretary of State to place candidates on the ballot who are "generally advocated or recognized in the news media in the United States or in Maryland," is far narrower by its terms than the statute struck down in *Shuttlesworth* and totally lacks the latter's penal character.

The statute declared unconstitutional in *Staub v. Baxley,* 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958), by Justice Whittaker is readily distinguishable from section 12–6(a)(1). In *Staub,* a municipal ordinance provided that persons seeking to solicit memberships for any dues-paying organization should first apply to the Mayor and City Council for a permit. The Mayor and City Council could refuse to grant the permit if they did not approve of the applicant or of the organization's "effects upon the general welfare of citizens of the City of Baxley." *Id.* at 314 n. 1, 78 S.Ct. at 278. Again, as in *Shuttlesworth,* criminal penalties could be imposed for violation of the statute. Justice Whittaker wrote that the statute constituted a prior restraint upon free speech and explained that "[t]hese criteria are without semblance of definitive standards or other controlling guides ...." *Id.* at 322, 78 S.Ct. at 282. The statutory standard of "effects upon the general welfare" of the citizens of the City is far less precise than the media recognition standard set forth in section 12–6(a)(1) of the Maryland Election Code.

In *Kunz v. New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951), New York City had adopted an ordinance which made it unlawful to hold public worship meetings on the streets without first obtaining a permit from the city police commissioner. The ordinance contained no mention of reasons for which a permit could be refused. The police commissioner had revoked plaintiff's permit "for good reasons." *Id.* at 293, 71 S.Ct. at 314. As in *Shuttlesworth,* failure to comply with the statute could result in imprisonment and/or fine. Chief Justice Vinson held the statute unconstitutional, writing: "We have here, then, an ordinance which gives an administrative official discretionary power to control in advance the right of citizens to speak on religious matters on the streets of New York. As such, the ordinance is clearly invalid as a prior restraint on the exercise of First Amendment rights. *Id.* at 293, 71 S.Ct. at 314. Chief Justice Vinson further wrote: "It is sufficient to say that New York cannot vest restraining control over the right to speak on religious subjects in an administrative official where there are no appropriate standards to guide his action." *Id.* at 295, 71 S.Ct. at 315. As in *Staub* and *Shuttlesworth,* the standard in *Kunz*—which was no standard at all—is readily distinguishable from the far narrower "generally advocated or recognized in the national or local news media" standard of section 12–6(a)(1).

In *Hynes v. Mayor and Council of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976), Chief Justice Burger held unconstitutional an ordinance requiring any person or organization desiring to solicit from house-to-house for a "recognized

charitable ... cause" to notify the police department "in writing, for identification only." *Id.* at 611, 96 S.Ct. at 1756. In striking down the ordinance, which was penal and which constituted a prior restraint on speech, Chief Justice Burger identified three infirmities. First, the coverage of the ordinance was unclear, as it did not explain whether a *"recognized charitable cause"* (emphasis in original) was one recognized by the Internal Revenue Service as tax exempt or one recognized by some community or municipal agency. In the case at bar, the Maryland media recognition statute *does* specifically state that a candidate must be recognized *by the news media in the United States or in Maryland.* Thus, there is no confusion, as in *Hynes* and *Mills,* regarding the meaning of the term "recognized," or the source of the required recognition.

The second flaw identified by the Chief Justice in *Hynes* was that the ordinance did "not sufficiently specify what those within its reach must do in order to comply." *Id.* at 621, 96 S.Ct. at 1761. In *Hynes,* a citizen desiring to solicit was required to notify the police department "in writing, for identification only" (at 611, 96 S.Ct. at 1756), but there was no indication of what the police would consider sufficient as to identification. Plaintiffs, in this case, argue that there is no indication of when a candidate is generally advocated or recognized in the news media in the United States or in Maryland. While the standard in section 12–6(a)(1) is somewhat nonspecific, its language is "capable of narrow and reasonable applications." *Kay v. Austin, supra* at 812. Judge Kennedy wrote in *Kay* that the language should be read not to require "endorsement by the national news media, but only that the national news media generally recognize that the individual is a potentially viable, but not necessarily successful, candidate." 621 F.2d at 812. Further, a candidate who is doubtful of whether he has attained general recognition in the national or local news

media may pursue, without substantial hardship, the petition alternative set forth in section 12–6(a)(2). Indeed, in this case, plaintiff LaRouche has done precisely that. By contrast, the possible consequences to a person or organization who failed to provide sufficient identification under the ordinance at issue in *Hynes* were far more severe, namely, imposition of penal sanctions. In the within context, in which the challenge is to a civil statute which poses no absolute bar to the exercise of First Amendment rights and no threat of penal sanctions, the specificity prong of *Hynes* is in no way offended.

The final infirmity identified by Chief Justice Burger in *Hynes* was that the ordinance held unconstitutional vested unreviewable discretion in the officials charged with enforcement. It is true that the Maryland statute at issue in this case, by its very terms, vests the Secretary with *sole discretion* to decide which candidates are generally advocated or recognized in the national or local news media. Yet such discretion does not render the statute impermissibly vague because the statute imposes upon the Secretary a sufficiently clear standard within which he or she must exercise that discretion. That same situation existed with regard to the statutory provisions in question in *Kay v. Austin, supra,* and *Belluso v. Polythress, supra.* As the Supreme Court recently wrote in another vagueness case, "[t]he language of the [statute] is sufficiently clear that the speculative danger of arbitrary enforcement does not render the [statute] void for vagueness." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., supra* 455 U.S. at 503, 102 S.Ct. at 1196.[11] In the absence of any evidence—which has not been adduced herein—of discriminatory enforcement, this Court, following the guidance of the Supreme Court in *Flipside,* is unwilling to conclude that the speculative danger of arbitrary enforcement renders the challenged statute void for vagueness.

**11.** In *Flipside,* Justice Marshall held that a penal ordinance requiring a license to sell "items ... designed or marketed for use with illegal canna-

bis or drugs" was not unconstitutionally vague. 455 U.S. at 500, 102 S.Ct. at 1194.

In sum, the Maryland statute challenged herein does not throttle free speech. Rather, at most, its media recognition provision may somewhat impair the exercise of certain protected First Amendment rights. But these rights, while labeled fundamental by the Supreme Court at one time or another, are not as fundamental as traditional, content-based free speech rights. Nor, in the within case, does the statute carry with it any possible penal sanctions. Accordingly, for the reasons set forth *supra*, plaintiffs' void-for-vagueness contention fails.

### Equal Protection

◼ Plaintiffs' second related contention is that section 12–6(a)(1) unnecessarily restricts fundamental rights and is violative of the equal protection clause. In a related vein, plaintiffs argue that the media recognition provision is too subjective a standard to be used to determine whether a candidate has a sufficient quantum of support to justify placement on a presidential primary ballot. Defendant counters by noting that section 12–6(a)(1) does not restrict ballot access, and even if it so does, the same is justified by compelling governmental interests. Finally, defendant argues that the petition provisions provide a reasonable alternative to ballot access under section 12–6(a)(1), and that when the two provisions are read *in pari*, there is virtually no restriction upon protected First Amendment rights.

In *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), Chief Justice Burger recognized that the state's interest in keeping its ballots within manageable, understandable limits is entirely legitimate. *Id.* at 144–45, 92 S.Ct. at 856–57. Earlier, in *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), Justice Stewart wrote that "[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even

frustration of the democratic process at the general election." *Id.* at 442, 92 S.Ct. at 1976. Writing subsequently in *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974), Justice Stewart noted in a similar vein that the state has the right to limit the field to serious candidates. *Id.* at 715–16, 94 S.Ct. at 1319–20. Moreover, the state may condition access upon a showing of a "significant, measurable quantum of community support." *American Party of Texas v. White, supra*, 415 U.S. at 782, 94 S.Ct. at 1306. In addition, the state may determine seriousness in terms of a candidate's subjective "desire and motivation." *Lubin v. Panish*, 415 U.S. at 715, 94 S.Ct. at 1319. Recently, the Supreme Court has again reiterated the important state interests governing ballot access. In *Clements v. Fashing*, 457 U.S. 957, 965, 102 S.Ct. 2836, 2844 (1982), Justice Rehnquist stated that "the States have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections." Thus, reasonable statutory support requirements are not constitutionally infirm per se. *See Arutunoff v. Oklahoma State Election Board*, 687 F.2d 1375, 1378 (10th Cir.1982). Such requirements become constitutionally infirm only if they operate to freeze the political status quo. *See Clements, supra* at 965, 102 S.Ct. at 2844; *Williams, supra* 393 U.S. at 25, 89 S.Ct. at 7. Accordingly, the Supreme Court has invalidated state ballot access laws which are oppressive and make it "virtually impossible for any but the two major parties to achieve ballot positions for their candidates." *Clements, supra* at 965, 102 S.Ct. at 2844.

Herein, the media recognition provision in section 12–6(a)(1) serves the legitimate—and important—state interests of providing a basis for reasonable assessment of the seriousness of an individual's candidacy and for exclusion of frivolous candidates from the ballot. As the Court observed in *Belluso v. Poythress, supra*, "recognition

in the media demonstrates a minimum degree of public support." 485 F.Supp. at 913. Moreover, not only is the purpose of the media recognition provision important, but the Maryland statute is not unnecessarily oppressive, as any injury to First Amendment voting and associational rights is limited because of the availability of the petition alternative which permits an individual to obtain placement on the Maryland ballot by obtaining the signatures of fewer than one-fourth of one percent of the State's registered voters.

The Supreme Court has repeatedly indicated that the absence or availability of alternative means of ballot access should be considered in assessing a state statute's constitutionality under the equal protection clause. In *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1979), Chief Justice Burger emphasized the absence of any alternative means of ballot access in holding a California election law unconstitutional:

> The absence of any alternative means of gaining access to the ballot inevitably renders the California system exclusionary as to some aspirants. As we have noted, the payment of a fee is an absolute, not an alternative, condition, and failure to meet it is a disqualification from running for office. Thus, California has chosen to achieve the important and legitimate interest of maintaining the integrity of elections by means which can operate to exclude some potentially serious candidates from the ballot without providing them with any alternative means of coming before the voters. Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of the State's legitimate election interests. Accordingly, we hold that in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay.

415 U.S. at 718, 94 S.Ct. at 1320. In his opinion in *Lubin*, Chief Justice Burger (at 718–19, 94 S.Ct. at 1320–21) expressly identified a petition requirement as a possible "reasonable alternative means," thus suggesting that had such an alternative existed, the California filing fee provision would not have resulted in constitutionally cognizable injury. Similarly, in *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), Justice Stevens pointed to the availability of alternative ballot access procedures in upholding a Georgia election law, writing: "The fact is, of course, that from the point of view of one who aspires to elective public office in Georgia, alternative routes are available to getting his name printed on the ballot.... We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other." *Id.* at 440–41, 91 S.Ct. at 1975–76. In the within case, the availability of the petition route operates to lessen any exclusive effect which may be attributable to the media recognition provision. The Maryland Election Code, when read in its totality, does not "unfairly or unnecessarily burden" a candidate's access to the ballot. *Lubin, supra* at 716, 94 S.Ct. at 1320.

Nor does section 12–6(a)(1) exclude or impose burdens on new or minority political parties. Thus, the instant case is distinguishable from *William v. Rhodes, supra,* and from *Anderson v. Celebrezze, supra.* Here, by contrast, plaintiff LaRouche sought placement on the ballot as a *Democratic* candidate, not as a minority or independent candidate. Further, the Maryland election statute, by its terms, applies only to the major political parties, *i.e.*, those "part[ies] who use a primary election" as a device to nominate a candidate for president. *See* Md.Ann.Code art. 33, § 12–6(a)(1). Thus, the challenged statute is not one which freezes the status quo to the detriment of minority parties.

Plaintiffs' contention that the media recognition standard is too subjective and should be replaced with an objective standard, such as whether a candidate has qual-

ified for matching funds, is also unpersuasive. In *Lubin v. Panish, supra,* Chief Justice Burger specifically noted that a state may judge a candidate's seriousness by his subjective "desire and motivation," 415 U.S. at 714, 94 S.Ct. at 1319. The media recognition provision is a permissible means of gauging the subjective desire of a candidate. Indeed, the Court in *Belluso* so held, stating (at 913):

> While Georgia has eschewed the more objective approach taken by states that have imposed filing fees and petition requirements, it has sought a principled means of evaluating a candidate's seriousness, on the theory that his or her recognition in the media demonstrates a minimum degree of public support.

In *Arutunoff v. Oklahoma State Election Board,* 687 F.2d 1375, 1380 (10th Cir. 1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983), the Tenth Circuit also rejected the contention that the State must adopt the least restrictive—or most objective approach—to ballot access. In so doing, Judge McWilliams wrote (at 1380):

> Counsel argues ... that there is a way of governing minor political parties which is less restrictive than the means prescribed by present statutes. We are not impressed with this argument.... The ultimate test is whether the particular election laws under attack, when considered in connection with other related election laws, unduly encourage maintenance of the political status quo or are oppressive to a degree that stifles the exercise of first amendment rights. As indicated, we do not believe the present laws to be constitutionally infirm.

In sum, section 12–6(a)(1) does not offend Fourteenth Amendment equal protection guarantees.

### Plaintiffs' As Applied Challenge Cannot Form the Basis for Relief in Light of Pennhurst State School & Hospital v. Halderman

█ Plaintiffs have sought, in the event that they are unsuccessful in their constitutional attack, a declaratory judgment that defendant Secretary of State arbitrarily applied section 12–6(a)(1) to plaintiff LaRouche in this instance. Assuming *arguendo* that this claim is not moot,[12] this Court is foreclosed from considering plaintiffs' argument that defendant failed to comply with state law under *Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In *Pennhurst,* the Supreme Court held that the Eleventh Amendment prohibits a district court from ordering a state official to conform his conduct to a valid state law. Therein, Justice Powell stated that a "federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when ... the relief sought ... has an impact directly on the state itself." —— U.S. at ——, 104 S.Ct. at 917, 79 L.Ed.2d at 89.

In the case at hand, the "as applied" claim against the State of Maryland under state law may not be heard in this federal court, because a federal district court is "without authority to enjoin a state officer to comply with the dictates of purely state law." *David Nursing Home v. Michigan Dep't of Social Services,* 579 F.Supp. 285, 288 (D.Mich.1984). Because this Court has concluded, for the reasons stated *supra,* that the challenged state law is constitutional, no federal issue remains in this case. The *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), exception to the Eleventh amendment, which applies when a state statute is declared unconstitutional and is, hence, "void," *Pennhurst, supra,* —— U.S. at ——, 104 S.Ct. at 909, 79 L.Ed.2d at 79–80, is "inapplicable in a suit against state officials on the basis of state law." *Id.* at ——, 104 S.Ct. at 911, 79 L.Ed.2d at 82. Rather, the reasoning of *Pennhurst* is fully conclusive:

> This need to reconcile competing interests [supremacy of federal law vs. constitutional immunity of the States] is wholly absent, however, when a plaintiff alleges that a state official has violated *state* law.... A federal court's grant of relief against state officials on the basis

---

12. *See* n. 5 *supra.*

of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Id.* at ——, 104 S.Ct. at 911, 79 L.Ed.2d at 82 (emphasis in original).

In *Woe v. Cuomo,* 729 F.2d 96, 102 (2d Cir.1984), the Second Circuit reached a similar conclusion. In that case, Judge Irving Kaufman wrote that an appellant's "as applied" state law contention was foreclosed by *Pennhurst,* and that "[t]o the extent this [contention] states that state officials are failing to comply with the state's own treatment requirements, we are foreclosed from entertaining the claim by the Supreme Court's second decision in *Pennhurst State School and Hospital v. Halderman.*" *Id.*

### Conclusion

Plaintiff's motion for relief will be fully denied and judgment will be entered for defendant. An appropriate Order to that effect is being entered today.