Lyndon H. LaROUCHE, Jr., et al.,

v.

Pauline R. KEZER, Secretary of State.

No. 2:92–CV–00095 (PCD).

United States District Court,
D. Connecticut.

Feb. 28, 1992.

Memorandum of Decision on
Motion for Reconsideration March 9, 1992.

Martha Stone, Jonel Newman, Connecticut Civil Liberties Union, Hartford, Conn., for plaintiffs.

Daniel Schaefer, Charles H. Benson, Asst. Attys. Gen., Atty. General's Office, Sp. Litigation, Hartford, Conn., for defendant.

## MEMORANDUM OF DECISION

DORSEY, District Judge.

*Parties*

Plaintiffs LaRouche and McCarthy are erstwhile candidates for nomination by the Democratic Party to be President of the United States. They sought to be placed on the presidential preference ballot in the Party's primary scheduled in accordance with Connecticut law for March 24, 1992. Their request was denied by defendant, who is sued in her official capacity as the Secretary of State of Connecticut. The remaining plaintiffs allege they are voters in Connecticut, registered with the Democratic Party, who wish and intend to vote for either Mr. LaRouche or Mr. McCarthy.

*Claims*

LaRouche and McCarthy allege their right, under the First and Fourteenth Amendments to the Constitution of the United States, as prospective candidates, to be placed on the primary ballot. The remaining plaintiffs allege their right, under the same amendments, to the full exercise of their right to vote for LaRouche or McCarthy, the candidate of their choice. Exhibits 1–7. The statute provides for two methods by which a candidate can be placed on the ballot. The first is by the Secretary's determination that a person is recognized in the news media as a serious and recognized candidate. The second is by a petition filed with a number of signatures. Plaintiffs claim that the first is

vague and arbitrary and the second is so burdensome as to deprive a prospective candidate of any meaningful opportunity to obtain placement on the ballot.

*Proceedings*

Upon filing their complaint, on February 6, 1992, plaintiffs moved for a preliminary injunction, seeking essentially the same relief as is finally sought here, a declaration that both procedures, by which placement of a name on the primary ballot is accomplished, are unconstitutional on the face of the statute, Conn.Gen.Stat. § 9–465, *et seq.*, and, as applied to defendant, that defendant should be barred from any steps in the primary process unless LaRouche and McCarthy are included on the ballot. An order to show cause issued and hearings were conducted around other trials, commencing on February 11, 1992 and concluding on February 20, 1992. Briefs were filed, the last on February 26, 1992.

*Facts*

The voter plaintiffs are registered Democrats and have expressed a wish and intent to vote for either LaRouche or McCarthy.

The principal statute is Conn.Gen.Stat. § 9–465, which delegates to the Secretary of State the authority to prepare the ballot for the parties' presidential preference primary, including the determination of the names to be included thereon. The decision as to a particular candidate is to be based on whether "the candidacy of such person ... is generally and seriously advocated or recognized according to reports in the national or state news media." § 9–465(a). Alternatively, a name is so placed if a petition signed by 6,518 party registered voters, on behalf of the candidate, is filed. § 9–465(b). The Secretary placed two names on the Democratic Party ballot even though not requested to do so. The others so placed filed requests and provided documentation in the form of news media clippings. Though requested, the Secretary declined to place either of the plaintiff candidates on the ballot even though documentation in their support was furnished. The Secretary did not follow any written procedure or criteria for her decisions as to whether a candidacy was "gen-

erally and seriously advocated or recognized". "Generally" is defined as without precision or limitation; broad; all encompassing. It is the epitome of vagueness. "Seriously" is meant to connote earnestness, with somber reflection. The Secretary and her deputy conducted no organized or searching inquiry as to the status of any candidacy. *See* Exhibit 26B. Nothing in the statute mandates the Secretary's seeking out candidates nor their qualification. In late 1991, anticipating the problem, they listed six Democrats that were seen as reasonably likely to be entitled to be placed on the Democratic Party ballot. Except for one candidate, Mr. Wilder, who publicly withdrew, all were placed on the ballot, including two who made no formal request. The Secretary did not require a request, as the statute did not require such. The Secretary and her deputy were attentive to several news media with which they were familiar, within the state and circulated into the state. These included The Hartford Courant; two local radio station news broadcasts; Time and Newsweek magazines; The New Britain Herald; other state papers which were seen from time to time but not consistently; and one or the other local TV station news broadcasts. No clipping service was obtained. No informational service search for news articles was obtained. As media articles were brought to her attention, they were considered. There was no organized staff gathering of articles. No record of most of what is above described was created. Individual files were created for all candidates considered and written material received was there filed, although some material pertained to more than one candidate and was only filed once. *See* Exhibit 21.

The Secretary decided that five of the original six listed—Brown, Clinton, Harkin, Kerry and Tsongas—met the test of § 9–465(a) and were placed on the Democratic ballot. Mr. Agran was also placed based on items in his folder which included his own releases and reports of voter support (20 and 2 per cent respectively). One item considered was a Westport Connecticut paper's report of a fund raising event for

Agran by two residents the Secretary considered active and involved in political affairs. Two references to him in the Hartford Courant, January 25 and 26, 1992, Exhibit 21, were negative. Along with President Bush and Mr. Buchanan, Mr. Duke was placed on the Republican ballot, without any reflection of news media reporting in his file, a decision the Secretary accompanied with a two-page statement, one and one-half of which articulated why he should not be so placed. *See* Exhibit 16. The Secretary noted extensive news coverage of Duke, largely related to controversial stands he has taken.[1] She was not uninfluenced, as quoted in the Journal–Inquirer on January 26, 1992, by the view of the Attorney General that a suit challenging a failure to put Duke on the ballot could not be defended, Exhibit 47, or, as he put it, he would have to decide if that were the case. Exhibit 46. A total of 39 names were considered. Exhibit 20.

The Secretary regarded practically any news media as embraced in the statute. Thus, all Connecticut papers would be included, along with its radio and TV stations. Widely circulated or broadcast media outside the state would also be considered.[2] The Secretary looked to the quantity of media reports as well as their substance in applying the statute. Thus, for example, a substantial fraction of LaRouche's documentation mentioned him as a candidate but in the same breath referred to his present imprisonment. Much of McCarthy's material was noted by her to have been published in campaigns of four, eight, and even twelve years ago, yet there was evidence of current articles in which he is mentioned in the New York Times; Christian Science Monitor; Washington Post; and Des Moines Register. Exhibit

21. No standard nor criteria was used to limit what publications would be considered nor with what relative weight. No standard nor criteria was developed by which to determine that a candidacy was advocated, by whom, by how many, with what degree of commitment, or enthusiasm to constitute advocacy. Nor was a standard promulgated by which to measure a sufficient degree of recognition nor by whom. Both LaRouche and McCarthy are making an effort, or one is being made on their respective behalf, to promote their candidacies. Exhibits 10; 11; 11A–E; 12A–B; 14; 15A–C; 17; 28–29; 31–35; 39–44. Both have supporters working on their behalf. Both LaRouche and McCarthy have put before the Secretary news articles from prior elections. No standard or criteria has been promulgated by which an appropriate weight can be attributed to news articles by their age. There was no standard nor criteria as to the relative significance in the candidates' own press releases, advertisements, polls, placement on the ballots of other states and on what basis.[3] No log or record of electronic media appearances was maintained. There was evidence of such appearances, some nationally broadcast. Exhibits 10; 11; 17; 55; 56. The Secretary provides no guide or advice to candidates on how to assure their being placed on the ballot. Indeed, she expressed a concern that if she did so she could be faulted for not being impartial among the prospects. She sends all who inquire or seem to be likely candidates a letter setting forth the technical requirements for being placed on the ballot. Exhibit 25.

Neither of the candidate plaintiffs attempted to obtain placement on the ballot by petition which required 6,518 signatures of registered Democrats. Exhibit 48.

---

1. The Connecticut Civil Liberties Union, disclaimed Duke's views in lobbying for his inclusion on the ballot. *See* Duke folder, Exhibit 21.

2. In this respect the Secretary differed from her counsel, who took the position that an out-of-state paper, not circulated in Connecticut and only circulated in a few states remote from here, would not be regarded as within the national news media.

3. LaRouche is on the ballot in sixteen states, two of which are recognition states such as Connecticut. McCarthy is on the ballot in six states, two of which are recognition states. The basis for their qualification is not entirely clear. Agran is on the ballot in eleven states. Duke is on the ballot in ten states. Per counsel for defendant, if a person appeared on the ballot in the vast majority of the states, the Secretary could not consider that fact unless it was reported in the state or national news media.

There was evidence of varying petition requirements in the number of signatures required and the time in which they were required to be obtained. Exhibit 36. At 1% with a two-week period, Connecticut's were among the most stringent. While there was evidence that suggested it was impossible, and no one has petitioned successfully since the statute was enacted in 1977, there was no evidence that any of the witnesses who so testified had been involved in an actual attempt to do so. There was no evidence as to the extent of the effort made by the eight who took out petition forms. While the forms are not available until after the list of those placed on the ballot by the Secretary is announced, from which the two weeks run, preparations can be made for a petition campaign long in advance. In 1990, now-Governor Weicker, petitioning state-wide for placement on the ballot as a candidate for Governor, in a seven-week period, successfully gathered well over 100,000 signatures. In 1970, for the offices of Governor and United States Senator, there were four petition candidates who obtained more than the signatures here required, but in a longer period. In all of these cases, the per week rate of getting the actual signatures was far higher than that for the required signatures in question here. As the defendant pointed out, 100 canvassers need get only 60 signatures per week to produce 12,000 signatures and provide a margin to assure the necessary 6,518. Is it work? Yes. Is it impossible? No.

*Discussion*

■ A person has a right to present his/her candidacy for political office to the electorate. While the state has an interest in ensuring an orderly voting process such that the result is the clear reflection of the will of an informed electorate, "the State must also provide feasible means for ... political parties and ... candidates to appear on the ... election ballot." *Storer v. Brown*, 415 U.S. 724, 728, 94 S.Ct. 1274, 1278, 39 L.Ed.2d 714 (1974). Thus, a state may impose a limitation on prospective candidates' access to the ballot to implement its interest so long as the method chosen does not unconstitutionally burden that ac-

cess and the voters' right to vote for the candidates of their choice. *Bullock v. Carter*, 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972).

Pursuant to its right to choose the method of protecting its interest, Connecticut has adopted a two-fold method by which a prospective candidate may be placed on a party's presidential preference primary ballot. Conn.Gen.Stat. §§ 9–465, *et seq.* If either is met, the name is so placed. Thus, the two are not interlinked and are severable. Neither effectively bars a prospective candidate. Thus, a totality approach, referred to in *Williams v. Rhodes*, 393 U.S. 23, 34, 89 S.Ct. 5, 12, 21 L.Ed.2d 24 (1968), is inapplicable where a candidate is not "absolutely and validly barred from the ballot by one provision of the laws." *Storer v. Brown*, 415 U.S. 724, 737, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974). Thus, Connecticut's two methods of ballot placement processing will be screened separately.

### A. *News Media Recognition*

■ This method charges the Secretary with the responsibility and authority of determining who is to be placed on the ballot if it is determined that the person's candidacy "is generally and seriously advocated or recognized according to reports in the national and state news media." Conn. Gen.Stat. § 9–465. The words used are inclusive, although they exclude one not so reported. The words "generally and seriously" are not quantifiable. As defined, "generally" connotes breadth. Together there are neither geographic nor demographic delineations. There is no method of measuring the terms, taken together or separately. While the test is not required to be quantifiable the Secretary cannot be vested with authority in a manner which, as here, leaves her with such latitude and unfettered discretion that she cannot be held accountable. The need to be advocated or recognized is likewise subject to no definable standard. Nor is a method of demonstrating qualification adequately set forth, as it is subject to the reporting of the news media. Their choices of what to re-

port is nowhere controlled. So also what constitutes the media is undefined. While one seeking to make the case for inclusion can argue the breadth of the test, there is no real way of being assured that the test has been met. Thus, an applicant can, before the deadline, neither be assured of demonstrating qualification, nor upon rejection be assured of the ability to hold the Secretary to an adequate standard such that it is demonstrated that extraneous considerations, arbitrary standards or bias is not the basis for the exclusion.

■ The evidence here does not demonstrate a bad faith exclusion by the Secretary nor an impropriety in the procedure used to obtain information based on which the decision could be made. Rather, the evidence showed the quandary of a Secretary attempting a good-faith discharge of her duties faced with extreme uncertainty of what she was required to do; how she was obliged to go about the task; what standard she was to apply; and how she was to measure the sufficiency of the advocacy and recognition reported in unspecified news media. Thus, she put Mr. Duke on the Republican ballot, without really knowing why and without any substantial documentation to support the required finding, in the face of her abhorrence at his candidacy. The constitutional test requires a standard so that an exclusion can be shown to be an implementation of the legitimate state interest, yet a full accommodation of the rights of voters, *see Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968); *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), and candidates by requiring the latter to show only "a significant modicum of support". *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971).

■ The standard of review of constitutional challenges to state action depends upon whether a fundamental right or suspect classification is involved. If so, the court must review the action under a "strict scrutiny" analysis and thus the action would only be upheld if justified by "a compelling state interest" which could not

be accomplished by a "less restrictive alternative." *E.g., Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). If not, the test is one of mere "rational relationship." *E.g., City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). The Supreme Court has vacillated over the years, in its opinion as to whether the right to be on the ballot is a fundamental right which requires a strict scrutiny analysis, or whether something less than strict scrutiny is appropriate. *See, e.g., Williams*, 393 U.S. 23, 89 S.Ct. at 5 (strict scrutiny required); *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) ("means reasonably related" is proper test); *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) ("far from recognizing candidacy as a 'fundamental right' we have held that the existence of barriers to a candidate's access to the ballot does not of itself compel close scrutiny"); *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) ("the impact of candidate eligibility requirements on voters implicates basic constitutional rights"). Federal courts interpreting these cases have held that although the rights involved are important and significant, they are less "fundamental" than content-based free speech rights. *See, e.g., LaRouche v. Sheehan*, 591 F.Supp. 917, 922 (D.Md.1984). Although a candidate's rights to access to the ballot might not implicate the highest level of scrutiny, the rights of those seeking to exercise their constitutional right to vote for those candidates must be analyzed under a strict scrutiny analysis. Thus, the "strict scrutiny" test will be used in analyzing Connecticut's "media recognition" statute as to both classes of plaintiffs, since that statute fails to pass constitutional muster even under the strictest scrutiny.

■ States undoubtedly have an interest in avoiding "laundry list" ballots that confuse voters, and in protecting the integrity of the democratic process. *See American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). Thus, certain restrictions on access to the ballot

are tolerated, although such restrictions must be balanced against the fundamental right of potential candidates to be on the ballot and of those seeking to exercise their fundamental right to vote for the candidate of their choice. *See Fashing*, 457 U.S. at 963–65, 102 S.Ct. at 2843–45. The Connecticut statute is constitutional therefore, only if the state's interest, found to be compelling, is accomplished by the least restrictive means.

 Plaintiffs claim the "media recognition" statute is unconstitutional on its face because it is unduly vague. A vague statute is not reasonably necessary to achieve the state's interest in regulating ballot access. *Duke v. Connell*, 790 F.Supp. 50, 53–54 (D.R.I.1992). A statute may be "void for vagueness" if a reasonable person must necessarily guess at its meaning because (1) the applicable coverage of the statute is unclear; (2) it fails to specify what those within its reach are required to do in order to comply; or (3) it permits public officials to exercise unreviewable discretion in their enforcement of it because of lack of standards. *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620–22, 96 S.Ct. 1755, 1760–61, 48 L.Ed.2d 243 (1976). The Connecticut "media recognition" statute fails for all three reasons.

It is not clear whether, in the first place, the phrase "generally and seriously advocated" is to be read separately from the phrase "recognized according to reports in the national or state news media." If so, the question arises, by whom must the candidate be generally and seriously advocated? What is the requisite degree of advocacy? Does rabid advocacy by a few equate to an enthusiastic advocacy by many? What do the words "generally" and "seriously" mean? What constitutes state media? Just Connecticut? How many states? What is national media? What of regional media? What constitutes "media?" The statute includes no objective criteria such as how many newspaper articles or television broadcasts about the candidate are sufficient to constitute "recognized," and there is no clue as to whether the media attention must be favorable or whether unfavorable publicity suffices. What of the quality of the reports? Are negative replies significant as to the advocacy? Thus, a candidate has no idea what presentation or case must be made to get on the ballot in Connecticut.

Furthermore, the Secretary of State, under the Connecticut scheme, has unreviewable discretion in determining which candidates get on the ballot. The statute provides no objective criteria by which the Secretary chooses the candidates. This subjects those seeking access to the ballot to the very real possibility that they may be kept off the ballot simply because the Secretary, does not read the "right" newspapers or listen to the "right" news stations. It also subjects the would-be candidates to possible personal political likes and dislikes of the particular Secretary in office.

### B. *Petition Process*

 The petition process is set forth in Conn.Gen.Stat. §§ 9–467–469. It requires 6,518 signatures of registered Democrats, for each candidate plaintiff, on forms available after the Secretary publishes her list of placements, § 9–465, to be filed with local registrars (who receive copies of the petitions with the signatures of those resident in the individual registrar's town) within two weeks, extended if the closing date falls outside the business week. This amounts to 1% of the Democratic party registration. While the time is not extensive and the number of required signatures is not insubstantial, it is not unduly burdensome. *See Storer*, 415 U.S. at 738–39, n. 10, 94 S.Ct. at 1283–84 n. 10 and cases cited therein. The state's interest in controlling the ballot can exclude those who cannot show "substantial support in the community by securing supporting signatures," *id.* at 732, 94 S.Ct. at 1280 (5% of the total voters in the last election for an independent candidate on the final ballot found proper). "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support." *Jenness*, 403 U.S. at 442, 91 S.Ct. at 1976.

Plaintiffs have not shown an actual impossibility. Their evidence suggested a possible failure, but there was insufficient to convince the court that a burden so onerous has been created as to make the petition route provided meaningless. Though subject to a high degree of scrutiny, Connecticut's screening process embodied in the petition method of ballot placement qualification is not so burdensome as to make access via the petition route meaningless. The chore of obtaining supporters' signatures is not an invalid means of measuring the level of support enjoyed by a candidate. Connecticut has set its required level of demonstrated support higher than most other states. That is the choice of the state. It is not for this court to dictate the appropriate level that fulfills the state's purpose and serves its interest. It is only within the authority of the court to invalidate the state's chosen level if it is so high, so onerous, so burdensome as to render the means of achieving the right to be on the ballot meaningless. That is for the plaintiffs to prove. They have not done so.

*Conclusion*

Accordingly, the petition method chosen by Connecticut is not found to violate either the first or the fourteenth amendments. As the candidate plaintiffs thus have not proven a total exclusion from the primary ballot, they are not entitled to a finding that the entire ballot designation process, §§ 9–465, *et seq.*, fails to meet constitutional muster. They had a means available to them which was not constitutionally infirm. Thus, they are not entitled to the relief requested, including specifically the request that the Secretary be ordered to place their names on the democratic ballot. Accordingly, judgment shall enter for defendant.

The judgment thus ordered vitiates the necessity for further barring the Secretary from proceeding with her statutory duties of carrying out the primary. Accordingly, the order previously entered barring her from doing so is vacated at this time.

The shortness of the time available to the court to hear and decide this matter, from its filing to the present, including the numerous side issues presented, briefed (even to the moment this decision was being signed) researched, considered and decided, mandated that it be heard and decided as a matter of a final injunction. That decision was and is sound. Yet plaintiffs have been afforded the opportunity to show that they were prejudiced by a final decision as opposed to a decision on a preliminary injunction. It may be that on the question of the petition route to being named on the ballot, plaintiffs should have the opportunity to make a further showing that that method is not just theoretically excessively burdensome, but in reality substantially impossible. It is not clear that plaintiffs have been so prejudiced, but to insure their protection the court will reserve to them the right to move for reconsideration, within fifteen days, on a showing of the availability of specific additional evidence as related to specified claims related to the petition procedure.

SO ORDERED.

## MEMORANDUM OF DECISION ON MOTION FOR RECONSIDERATION

(1) Because of the finding that the media recognition statute, Conn.Gen.Stat. § 9–465(a), was unconstitutional, enforcement of that section was vitiated. That rendered moot plaintiffs' claim that "as applied" the statute was also unconstitutional.

(2) Plaintiffs' essential claim for relief was an order that plaintiffs LaRouche and McCarthy be placed on the ballot. Though prevailing on the challenge to § 9–465(a), plaintiffs were found not to have proven that the petition method of being placed on the ballot was unduly burdensome and it was therefor not unconstitutional. As there was a means by which McCarthy and LaRouche could have gotten onto the ballot, pursuant to a constitutionally valid procedure, they are not entitled to the relief sought.

(3) Plaintiffs are not entitled to a stay. The burden to the state of a stay of preparations for the primary on March 24 is potentially of considerable magnitude.

It is an over-simplification to argue, as do plaintiffs, that simply putting LaRouche and McCarthy on the ballot is no problem to the state, for they have not qualified for such placement and have not been entirely prevented from being so placed by an un-constitutional screening process. Plaintiffs' challenge to the petition procedure is not strong and cannot be found likely to succeed. Plaintiffs will lose the chance to be placed on the March 24 ballot unless the court of appeals rules differently, but plaintiffs never tried to obtain placement by the petition route, in at least one case by the conscious decision not to commit the resources to the necessary signature solici-tation. The public interest lies stringent in favor of permitting the primary to be held in an orderly process. Plaintiffs chose not to petition. They should not be excused from exhausting their right to obtain place-ment for that reason.

▮▮▮ (4) The statutory scheme had two alternative methods by which plaintiffs could have been placed on the ballot. The validity found in the petition method meant that plaintiffs were not unconstitutionally barred from the ballot. As one valid means existed, they were not entitled to be placed on the ballot. For the court to do so would deny the state's right to protect its interest by a valid screening process. To that extent, this court does not concur with *Duke v. Connell*, 790 F.Supp. 50 (D.R.I. 1992). Thus, while the plaintiffs were not entitled to placement on the ballot, the finding as to § 9–465(a) does entitle them to an injunction barring the state's enforce-ment of the screening process as pre-scribed by § 9–465(a). Thus, judgment to that effect is in order and shall be so ordered. Plaintiff shall submit a judgment to such effect. Plaintiffs are not entitled to bar the placement on the ballot of other candidates who were not made parties to this action. To enter an order affecting their status, obtained before this challenge was brought to court and decided, without their being heard is patently improper.

(5) Plaintiffs were not held to prove the petition process was impossible. The prop-er standard, the constitutionally permitted burden, was applied. Plaintiffs did not make the necessary showing that their right to placement on the ballot was uncon-stitutionally burdened by the petitioning process. Having a constitutionally valid process by which to seek placement, plain-tiffs have failed to utilize same and it is not for the court to excuse them from a consti-tutionally valid burden chosen by the state to protect its interest in an orderly pri-mary. Though plaintiffs have thus lost the opportunity for LaRouche and McCarthy to be on the ballot, that was the candidates' choice when they determined not to make the petition signature solicitation. Though expansive ballot access is a proper goal, excusing plaintiffs from undergoing a law-ful screening process is not for the court to order.

Accordingly, plaintiffs' motion is granted to the extent that a modified judgment will enter enjoining defendant from enforcing the media recognition procedure set forth in § 9–465(a). In all other respects the prior memorandum of decision will stand.

SO ORDERED.