Richard B. KAY

v.

Frances Jones MILLS, Secretary of State, Frankfort, Kentucky; Raymond F. Bossmeyer, Member of State Board of Elections; Earl Searcy, Member of State Board of Elections.

Civ. A. No. 80–11.

United States District Court,
E. D. Kentucky,
Frankfort Division.

May 2, 1980.

C. Thomas Anderson, Gen. Counsel, Com. of Ky., John F. Zink, Asst. Atty. Gen., Frankfort, Ky., for defendants.

Richard B. Kay, in pro. per.

## MEMORANDUM OPINION

BERTELSMAN, District Judge.

### STATEMENT OF FACTS

This action arises out of the attempt by Richard Kay, an announced candidate for

the Democratic party nomination as President of the United States, to have his name placed on the ballot in the Kentucky Presidential Primary.

The Statutes of the Commonwealth of Kentucky allow candidates for the presidential nomination of political parties two ways to gain access to the primary ballot. The applicable statutes are:

K.R.S. 118.580 **Nomination of candidates by state board of elections.**—"The state board of elections shall convene in Frankfort fifty-five (55) days before the date fixed by law for the holding of primary elections. At the meeting required by this section, the board shall nominate as presidential preference primary candidates all those generally advocated and nationally recognized as candidates of the political parties for the office of President of the United States. Immediately upon completion of this requirement, the board shall transmit a list of all such nominees selected to the secretary of state and shall also release the list to the news media."

K.R.S. 118.590 **Nomination of candidate by petition.**—"(1) Any person seeking the endorsement by a political party for the office of president of the United States who has not been nominated by the state board of elections, or any group organized in this state on behalf of, and with the consent of, such person, may file with the secretary of state certified petitions signed by five thousand (5,000) persons who, at the time they signed, are registered and qualified voters in this Commonwealth and are affiliated, by such registration, with the same political party as the candidate for whom petitions are filed.

"(2) Such petitions shall be filed by the petitioners with the Secretary of State no later than fifty-five (55) days before the date fixed by law for the holding of the primary election.

"(3) The petitions must state: (a) The name of the candidate for nomination and the party of which he is a member; (b) The name and address of the chairman of the group circulating such petition.

"(4) The secretary of state shall forthwith determine the sufficiency of petitions filed with him and shall immediately communicate his determination to the chairman of the group which has filed said petitions."

In October of 1978, the plaintiff, Richard Kay, held a press conference in Washington, D.C., where he announced that he would seek the presidential nomination of the Democratic party. Running a "one-man campaign" he appeared in 30 states, meeting frequently with representatives of the news media. He appeared on the presidential primary ballots in New Hampshire, Georgia, Florida, and Louisiana, and will appear on the ballot in Ohio.

In early 1980, Mr. Kay notified the Kentucky State Board of Elections of his desire to appear on the Kentucky Democratic presidential primary ballot through K.R.S. 118.580. To aid the Board in its determination that he fit the description in the statute, he sent a packet containing articles and stories concerning his candidacy which had been published in various newspapers around the country. In February of 1980, in a further effort to educate the Board as to his status, he informed it that he had been placed on the ballot in Florida and Georgia under statutes similar to K.R.S. 118.580.

On February 14, 1980, the defendant Mills, acting in her capacity as chairman of the State Board of Elections, notified the plaintiff Kay that his name had been placed on the list for nomination, and he would be officially notified after the nominations were made.

On April 2, 1980, the State Board of Elections met to select names to be placed on the presidential primary ballot. The statute which determines the membership of the Board is K.R.S. 117.015. The Board

consists of the Secretary of State and two members appointed by the Governor. The two appointed members are drawn, one each, from lists of five names submitted by the State Central Executive Committee of each of the two political parties that polled the largest vote in the last preceding election for state officials. Presently, Earl Searcy is the Republican member and Ray Bossmeyer is the Democratic member.

At the April 2nd meeting the Board placed Benjamin Fernandez of California, Ronald Reagan of California, Harold Stassen of Washington, D.C., John Anderson of Washington, D.C., and George Bush of Texas on the Republican ballot. On the Democratic side Jimmy Carter of Georgia, Edward Kennedy of Massachusetts, and Clifford Finch of Mississippi were placed on the ballot. All the names which were placed on the ballot were so placed through K.R.S. 118.580. No candidates used the petition method provided in K.R.S. 118.590.

Two candidates, Lyndon LaRoche and the plaintiff Richard Kay, who had submitted their names to the Board as potential Democratic candidates were not placed on the ballot.

The evidence shows that the Board has no regulations or fixed criteria used to distinguish between candidates which it deems "generally advocated and nationally recognized as candidates" and those it does not. The plaintiff was not notified that he was not to be placed on the ballot until on his own initiative he contacted the State Board of Elections on April 11, 1980.

Promptly thereafter, namely on April 14, 1980, the plaintiff Kay filed this action in the Frankfort division of this court. On the same day, by order of Hon. Bernard T. Moynahan, Jr., Chief Judge of the United States District Court for the Eastern District of Kentucky, the case was assigned to the undersigned judge. A motion for a temporary restraining order and/or preliminary injunction having been filed with the complaint herein, the case was set for a hearing on such motion and all other pending matters on April 17, 1980.

At the hearing of April 17, Mr. Kay appeared in propria persona, presented evidence under oath and submitted affidavits. Testimony was heard from a representative of the Board of Elections, and certain stipulations were also made with regard to the procedures of the Board and other matters.

Because of the exigencies of the time limitations involved, after an initial review of the law, the court entered a preliminary injunction on April 23, 1980, prohibiting the printing or distribution of the ballots unless plaintiff's name appeared thereon. That injunction must now be made permanent.

### ELEVENTH AMENDMENT

■ The defendants have raised the argument that the eleventh amendment bars an action of this type. However, the court is persuaded that this action, brought against the individual defendants rather than the state and purely prospective in the relief it seeks, falls squarely in the exception to the eleventh amendment bar enunciated in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In that case the Supreme Court determined that while the eleventh amendment does ordinarily bar federal courts from ordering states to give monetary relief, it does not ordinarily prevent courts from requiring state officers to comply with federal injunctions. *See also, Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

■ The defendants further assert in connection with their eleventh amendment argument that no relief can be granted to the plaintiff in the way of placing him on the ballot since the statute instructs the board to meet and act 55 days before the date fixed for the primary election. Therefore, the defendants argue, no official action can be ordered except retroactively, since the date has passed and no other date is authorized by the statute. This argument is without merit.

The State Board of Elections certainly has inherent power to correct, at a later time, any mistakes made at the meeting

specified. It should be further noted that the statute in question and related statutes which refer to the meeting are not couched in exclusionary language. That is to say, while the statute clearly calls for a meeting 55 days before the primary election, it does not say the State Board cannot meet at other times and take appropriate actions in the face of unexpected events.

## THE NATURE OF THE RIGHT ASSERTED

■ Courts and commentators have failed to define clearly the nature of the right asserted by a candidate seeking access to the ballot on a constitutional basis. The defendants correctly point out that a state does have legitimate interests in regulating elections. One such interest is the prevention of voter confusion by limiting the number of persons on the ballot and discouraging frivolous candidacies. *See Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

■ The defendants also assert that a person has no constitutional right to have his name placed on the ballot. This is an oversimplification, since a state must exercise its conceded power to regulate elections in a constitutional manner. As with any other matter which the state has power to regulate, it cannot impose limitations on access to the ballot which constitute a denial of equal protection or due process of law in contravention of the fourteenth amendment to the Constitution of the United States. *Bullock v. Carter*, 405 U.S. 134, 141, 92 S.Ct. 849, 854, 31 L.Ed.2d 92 (1972).

Thus, in *Williams v. Rhodes, supra*, the Court said:

"The State also contends that it has absolute power to put any burdens it pleases on the selection of electors because of the First Section of the Second Article of the Constitution, providing

that 'Each State shall appoint in such Manner as the Legislature thereof may direct, a Number of Electors * * *' to choose a President and Vice President. There, of course, can be no question but that this section does grant extensive power to the States to pass laws regulating the selection of electors. But the Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas; these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." [1]

It has been suggested that a plaintiff, who asks a court to order his name placed on the ballot for constitutional reasons, is asserting not his own constitutional rights, but those of citizens who might wish to vote for him.[2]

It seems to this court, however, that this is a distinction without a difference. As observed by the Court in *Bullock v. Carter, supra*:

". . . the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." [3]

Further, in *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974), the Supreme Court held that, absent reasonable alternative means of ballot access, a state may not require payment of a filing fee from an indigent candidate, as a condition of placing his name on the ballot. Although recognizing the state's legitimate interest in regulating elections, the Court said:

"This legitimate state interest, however, must be achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in

---

1. 393 U.S. at 28–29, 89 S.Ct. at 9.

2. *See* L. Tribe, *American Constitutional Law*, §§ 13–18 through 13–20 (1978); Note, *Developments in the Law-Elections*, 88 Harvard L.Rev.

1111 (1975) [hereinafter Harvard Note]. *Cf. Williams v. Rhodes*, 393 U.S. at 30, 89 S.Ct. at 10.

3. 405 U.S. at 143, 92 S.Ct. at 856.

the continued availability of political opportunity. The interests involved are not merely those of parties or individual candidates; the voters can assert their preferences only through candidates or parties or both and it is this broad interest that must be weighed in the balance. The right of a party or an individual to a place on a ballot is entitled to protection and is intertwined with the rights of voters." [4]

Finally, in the recent case, *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), the Court found that a statute, which required a candidate for Mayor of Chicago to gather more signatures on a nominating petition than some candidates for statewide office, was an unconstitutional denial of equal protection. Alluding to the "significant role that third parties have played in the political development of the Nation," [5] the Court held that, even when pursuing its legitimate regulatory interests, " 'a State may not choose means that unnecessarily restrict constitutionally protected liberty.' " [6]

It is noteworthy that in both *Lubin* and *Illinois State Board, supra*, individual candidates were plaintiffs. In *Lubin*, the only issue was whether an individual candidate for a local office could be required to pay a filing fee. There the Court stated that the issue before it was the candidate's claim that the challenged statute "deprived *him* . . . of the equal protection guaran-

teed by the Fourteenth Amendment and rights of expression and association guaranteed by the First Amendment." [7]

■ As this court sees it, a synthesis of the above authorities indicates that the law has evolved at least to the stage where the following principles may be stated. Although the right of a potential candidate to be placed on the ballot is not as unrestricted as his right to freedom of speech or freedom of religion, any regulation of access to the ballot must conform to the principles of equal protection and due process, guaranteed by the fourteenth amendment. Associational rights of the candidate's supporters are also involved,[8] but he may assert his own fourteenth amendment rights in an action such as this.[9]

■ Therefore, plaintiff here is properly demanding this court's protection of his right not to be subjected to discriminatory or arbitrary treatment. In seeking such protection he invokes the void-for-vagueness doctrine. That one situated similarly to the plaintiff may assert this doctrine has been specifically recognized.[10]

### K.R.S. 118.580 IS VOID FOR VAGUENESS.

■ The plaintiff herein challenges the constitutionality of K.R.S. 118.580, which permits the Kentucky State Board of Elec-

---

**4.** 415 U.S. at 716, 94 S.Ct. at 1320.

**5.** 440 U.S. at 185, 99 S.Ct. at 991.

**6.** *Ibid. quoting Kusper v. Pontikes*, 414 U.S. 51, 58–59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973). With regard to the increasing recognition of independent parties and minority, "dark horse," and "one issue" candidates, see discussion at pp. 852–853, infra.

**7.** 415 U.S. at .710, 94 S.Ct. at 1317 (emphasis added).

**8.** *See Lubin v. Panish*, 415 U.S. at 716, 94 S.Ct. at 1320.

**9.** Plaintiff here unsuccessfully brought a similar action in the United States District Court for the Western District of Michigan, there at-

tacking a differently worded statute. The District Judge held plaintiff lacked standing to bring the action, based on his failure to exhaust the other means of gaining access to the ballot. Plaintiff Kay appealed the dismissal of his action to the Sixth Circuit. Although it upheld the statute, that court recognized plaintiff's standing to assert his own constitutional rights, and held that abstention was inappropriate. *Kay v. Austin*, No. 80–1292, 621 F.2d 809 (6th Cir., April 30, 1980). For further discussion, *see* p. 853, infra.

**10.** *Gerende v. Board of Supervisors*, 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745 (1951) *cited with approval* in *Baggett v. Bullitt*, 377 U.S. 360, n. 7, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); *Kay v. Austin, supra* note 9.

tions to place on the presidential preferential primary ballot candidates the Board finds to be "generally advocated and nationally recognized as candidates of the political parties for the office of President of the United States."

The argument is principally based on the due process clause of the fourteenth amendment. Nevertheless, equal protection considerations are involved in that the statute, as hereinafter discussed, has the potential for discriminatory treatment of persons such as the plaintiff. There was also evidence that the statute has, in fact, been discriminatorily applied against plaintiff, in that he contends that the Board placed persons on the primary ballot who were no more nationally recognized and generally advocated than he.[11]

The defendants invite the court, if it determines that plaintiff is entitled to relief, to decide the case on the narrow ground that the State Board of Elections abused its discretion with regard to the plaintiff. However, the court, having attempted to accept this invitation, finds that the statute is far too nebulous to determine what criteria the Board would be justified in taking into consideration in determining whether a potential candidate is "generally advocated and nationally recognized." This difficulty illustrates the inherent vice of the statute. Therefore, no narrower approach being

available, the court is left with no alternative but to hold the statute unconstitutional.

■ The so-called "void-for-vagueness doctrine" is an integral rampart in the citadel of constitutional liberty. It is based on two fundamental constitutional precepts. First, a citizen should not be compelled by law to engage in or refrain from activity, when he cannot intelligently discern what activity is required or prohibited.[12] Second, a citizen's exercise of important rights may not be made subject to the unreviewable discretion of a public official or agency.

Illustrative of the type of case in which the first precept is a primary consideration, are cases where freedom of speech or assembly is regulated. In one case an ordinance was struck down forbidding citizens to assemble and "conduct themselves in a manner annoying to persons passing by."[13] Other cases have held that public employment may not validly be conditioned upon the taking of an unduly vague loyalty oath.[14]

A good illustration of the second precept may be found as far back as 1886, in a case in which the Supreme Court of the United States held that the right to engage in the laundry business in the City of San Francisco could not be made dependent on the uncontrolled discretion of the City's Board of Supervisors, especially where in applica-

---

11. The testimony of the only witness for the defendants indicated that one candidate for the Democratic presidential nomination had been placed on the ballot primarily because he was the ex-governor of a state, although plaintiff was on the primary ballot in other states where this candidate had not qualified. Neither had qualified for federal matching funds, qualification for which was said to be a primary factor in the Board's consideration.

12. This precept generally arises in criminal cases, but is applicable to civil cases, as well, at least where a constitutional right is involved. The following cases show that the doctrine is applicable where the denial of a right or privilege is at stake. *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (federal employment); *Law Students Civil Rights Research Council, Inc. v.*

*Wadmond*, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971) (admission to bar); *Gerende v. Board of Supervisors, supra,* note 10 (candidacy for public office); Baggett v. Bullitt, *supra* note 10 (employment at state university).

13. *Coates v. Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). *See also Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) where a state law punishing "opprobrious words or abusive language, tending to cause a breach of the peace" was invalidated. *See* Note, *The Void-for-Vagueness Doctrine in the Supreme Court*, 109 U.Pa.L.Rev. 67, 82 n. 78. (1960) [hereinafter Pennsylvania Note.]

14. *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); *Cramp v. Board of Public Instruction*, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961).

tion the statute was being used to discriminate against the Chinese race.[15]

Quoting the Supreme Court of Maryland in a prior case, the Court adduced considerations which are still relevant to any law which commits substantial rights of citizens to the unreviewable discretion of public officials:

" 'But it [the law] commits to the unrestrained will of a single public officer the power to notify every person who now employs a steam-engine in the prosecution of any business in the city of Baltimore, to cease to do so, and, by providing compulsory fines for every day's disobedience of such notice and order of removal, renders his power over the use of steam in that city practically absolute, so that he may prohibit its use altogether. But if he should not choose to do this, but only to act in particular cases, there is nothing in the ordinance to guide or control his action. It lays down no *rules* by which its *impartial execution* can be secured or partiality and oppression prevented. It is clear that giving and enforcing these notices may, and quite likely will, bring ruin to the business of those against whom they are directed, while others, from whom they are withheld, may be actually benefited by what is thus done to their neighbors; and, when we remember that this action or non-action may proceed from enmity or prejudice, from partisan zeal or animosity, from favoritism and other improper influences and motives easy of concealment and difficult to be detected and exposed, it becomes unnecessary to suggest or to comment upon the injustice capable of being brought under cover of such a power, for that becomes apparent to every one who gives to the subject a moment's consideration. In fact, an ordinance which clothes a single individual with such power hardly falls within the *domain of law*, and we are constrained to pronounce it inoperative and void.' " [16]

Applying similar principles in a different context is a more recent case of the Supreme Court of the United States, prohibiting the showing of a motion picture if an official determined that it was "sacrilegious." [17] Some of the other cases principally concerned with unreviewable official discretion are set forth in the margin.[18]

The most recent Supreme Court decision applying the vagueness doctrine appears to be *Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976), upon which the plaintiff herein places great reliance. An analysis of that case demonstrates that plaintiff's reliance is justified and that it is controlling of the case at bar.

The similarity of the language of the legislative provisions involved in *Hynes* and the instant case is striking. In *Hynes*, the Court invalidated a municipal ordinance requiring advance notice to be given to the local police department by any person "desiring to canvass, solicit or call from house to house . . . for a recognized charitable cause . . . or . . . political campaign or cause. . . . for identification only." [18A]

The Court held the ordinance must fall because "men of common intelligence must

---

**15.** *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

**16.** 118 U.S. at 372–73, 6 S.Ct. at 1072. This court recognizes that the void-for-vagueness doctrine originated in the era of substantive due process and that the economic complexity of modern society has required its relaxation as it applies to the regulation of commercial activity because of the necessity of allowing administrative regulation. However, the principles set forth in the quotation in the text with regard to unreviewable official discretion are still applicable in constitutional liberty cases. *See* Pennsylvania Note, *supra* note 13, at 74, n. 38.

**17.** *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

**18.** *Staub v. City of Baxley,* 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); *Superior Films, Inc. v. Department of Education,* 346 U.S. 587, 74 S.Ct. 286, 98 L.Ed. 329 (1954); *Gelling v. Texas,* 343 U.S. 960, 72 S.Ct. 1002, 96 L.Ed. 1359 (1952); *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); *See* Pennsylvania Note, *supra* note 13, at 69ff.

**18A.** Another ordinance required solicitors not meeting these criteria to obtain a permit.

necessarily guess at its meaning."[19] In so holding the Court examined the implications of the ordinance in three respects. First, the coverage of the ordinance was unclear in that it could not be determined by whom a charitable cause must be "recognized" to be under the ordinance. Second, the Court held that "the ordinance does not sufficiently specify what those within its reach must do in order to comply."[20] Third, and most important here, the Court found the ordinance was vitiated by the fact that it lacked standards, and so gave the police "the *effective* power to grant or deny permission to canvass for political causes."[21]

Applying these criteria to the facts of the case at bar, the inherent vice of K.R.S. 118.580 immediately becomes apparent. Those attempting to comply with it, such as plaintiff here, must necessarily guess at its meaning, and make important decisions based on such unavoidable guesswork. For example, if plaintiff was not eligible to be placed on the ballot pursuant to the statute, his only other alternative was to seek to gather 5,000 signatures by petition,[22] a substantial undertaking. Yet, there was no ascertainable standard by which he could determine whether or not he complied. When the Board of Elections informed him that it was not placing his name on the ballot, it was too late for him to take any alternative action.

With respect to the second consideration of *Hynes*, the statute did not sufficiently specify "what those within its reach must do in order to comply." Plaintiff was not informed whether in order to establish himself as "generally advocated and nationally recognized" he had to show that he had a substantial number of supporters in states other than Kentucky. If so, what number of states would be sufficient? Or did he

have to show recognition by the media? If by media, was recognition by local media in a number of places sufficient? What geographical distribution of such local media would be satisfactory? Or did the recognition have to be by national media?

Plaintiff took the position that being recognized by the media of a number of states, together with the fact that he was on the primary ballot in several states was sufficient. The Board did not agree with his determination. Yet, can a reviewing court say that the Board was wrong, or that plaintiff was wrong? The fact that an unduly vague law deprives a court of the ability to review potentially arbitrary or discriminatory decisions of public officials, is one of the principal reasons for the void-for-vagueness doctrine.[23]

Finally, the application of the third criterion of the *Hynes* Court most effectively illustrates the inherent flaw in this statute. This is the consideration of unreviewable discretion. The members of the State Board of Elections, however sincere or well motivated, are nonetheless political people. The Board is composed of the Secretary of State of the Commonwealth, who is an elected official, and one person appointed by the Governor from each of the two major political parties, from a slate proposed by the executive committees of those parties.

Because they have a substantial partisan interest in the outcome of the election, legislators or officials may not act in a neutral fashion when dealing with ballot access. Consequently, strict judicial scrutiny is in order, and the usual presumption of validity of statutes or regulations is inappropriate.[24] Considering the partisan political nature of this Board, granting it unreviewable discretion to decide who will gain

---

**19.** 425 U.S. at 619, 96 S.Ct. at 1760, *citing Connally v. General Construction Company*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

**20.** 425 U.S. at 621, 96 S.Ct. at 1761.

**21.** *Id.* at 622, 96 S.Ct. at 1761.

**22.** K.R.S. 118.590.

**23.** *See* Pennsylvania Note, supra note 13, at 89.

**24.** *See Kramer v. Union Free School District*, 395 U.S. 621, 628, 89 S.Ct. 1886, 1890, 23 L.Ed.2d 583 (1969); Harvard Note, *supra* note 2, at 1136, n. 87.

access to the Presidential primary ballot provides a situation so fraught with potential for abuse as to render the statute void.

It is a matter of common knowledge, of which the court may take judicial notice, that state primaries have become more important than in prior years in determining who will be nominated as presidential candidates by the political conventions of the major parties. This is the reason why Kentucky established a presidential primary in the first instance. It is in the public interest that the citizens of Kentucky should be able to voice their preferences on such an important matter. But for that public interest to be properly served, it is essential that the choice of candidates not be limited to those arbitrarily selected by persons whose motives may be of a partisan political nature.

Two situations come to mind, neither of which are at all improbable, where the potential for abuse in this statute is particularly apparent. The first, which is presented by the case at bar, is that in which a "dark horse" candidate desires to be placed on the presidential primary ballot. The Board, selected from the political establishment, may well be tempted to place on the ballot only those who are acceptable to that establishment and to disfavor those whose candidacy would cause difficulties for the entrenched state and national political hierarchy. Had the Kentucky presidential primary been held early in 1976, the present President of the United States perhaps could have been arbitrarily excluded under the statute. Six months ago, the candidacy of Mr. Anderson, who has now been placed by the Board on the Republican presidential ballot, might have been excluded.

The second situation where the potential for abuse is great under this statute is that of so-called "one issue" candidates. It is not uncommon today for advocates or opponents of free abortion, women's liberation, tax limitation, or similar causes, to proffer themselves as potential candidates for the nomination for President. Although they may have more of a desire to espouse their particular views than a realistic expectation of being elected President, their contributions to the marketplace of ideas are nevertheless significant, and they may not be excluded in an unconstitutional manner.[25]

Either a "dark horse" or "one issue" candidate's being on the ballot may cause serious political problems to the candidate preferred by the political establishment. An administrative agency such as the State Board of Elections may not constitutionally be vested with the unreviewable discretion to exclude such candidates from the ballot, any more than the chief of police of Oradell may constitutionally possess "the *effective* power to grant or deny permission to canvass for political causes."[26]

For the above reasons, the statute under consideration must succumb to plaintiff's constitutional attack. This is not to say that national recognition is not a valid, rational basis for placing a candidate on a presidential ballot, or that a state administrative agency may not be vested with the power to decide what candidates have met such a standard. This court holds only that this discretion may not be uncontrolled. In the words of a leading case, the defect in the statute is that,

"No standards appear anywhere; no narrowly drawn limitations; no circumscribing of the absolute power; no substantial interest of the [public] to be served. It is clear that all that has been said about the invalidity of such limitless discretion must be equally applicable here."[27]

**25.** *See Illinois Elections Board v. Socialist Workers Party*, 440 U.S. 173, 185, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979). In *Lubin v. Panish*, 415 U.S. 709, 713, 94 S.Ct. 1315, 1318, 39 L.Ed.2d 702 (1974), the Court noted that in recent years the emphasis has changed from promoting short, manageable ballots to providing access to the ballot, in order to facilitate the expression of political views and the exercise of associational rights. *See Williams v. Rhodes*, 343 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968); Harvard Note, *supra* note 2, at 1123.

**26.** *Hynes v. Mayor of Oradell*, 425 U.S. at 622, 96 S.Ct. at 1761.

**27.** *Niemotko v. Maryland*, 340 U.S. 268, 272, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951). *Cf. Kent v.*

This defect must be corrected in any valid statute, which attempts to accomplish the purpose of the statute invalidated here.

After this opinion had been almost completed, the United States Court of Appeals, for the Sixth Circuit handed down a decision[28] in an action by plaintiff here seeking an injunction placing him on the Democratic Presidential primary ballot in Michigan. The Michigan statute,[29] which the appellate court upheld against a vagueness challenge, provided for placement on the primary ballot by the Michigan Secretary of State of "individuals generally advocated by the national news media to be potential presidential candidates."

The case is distinguishable in that the Michigan statute, although subject to some of the same criticisms as the statute struck down here, is more narrowly drawn. At least the aspiring candidate in Michigan knows from whom he must seek recognition.[30] In this court's view the Michigan statute marks the borderline of the permissible zone, and the Kentucky statute falls beyond the pale. In addition, the precedential value of the decision was weakened by the fact that plaintiff in that case was held to have been guilty of laches.

### REMEDY

◼ The problem with regard to the relief to be granted herein is that none of the candidates appearing on the ballot for either major party qualified by filing petitions under K.R.S. 118.590. Therefore, if K.R.S. 118.580, which provides for the Board of Elections to determine whose names shall appear on the ballot, is unconstitutional, can anyone's name be listed?

The position taken in this action by the parties on this issue is somewhat surprising. The plaintiff does not contend that any other candidate's name should be removed from the ballot, but desires only that his name be listed. The defendants, however, formally stated at the hearing that their position was that, if K.R.S. 118.580 is unconstitutional, none of the candidates' names may appear, because none qualified by filing petitions.

Similar problems have been dealt with in other election cases, but little analysis of the logical difficulties involved in fashioning a remedy is to be found. In *Williams v. Rhodes, supra,* the entire statutory scheme for new political parties to qualify to have their candidates appear on the ballot was declared unconstitutional. The same problem that we have here was present in that case. If the existing statutes were struck down, no other means of qualifying was provided by any other statute. Nevertheless, the Court ordered that the candidates of some of the plaintiff parties be listed.[31]

In a comparable case a three-judge district court granted similar relief under similar circumstances.[32] Neither case adduced any analysis of the propriety of the relief granted, however.

The solution to the problem is to be found in practicality and common sense. It would do the plaintiff no good to strike the names of the other candidates[33] from the ballot, and such a course of action would be unconscionable both to those candidates and to the public interest. The fairest and most practicable solution, which will preserve the rights of the plaintiff, and also the rights of the other candidates and the public, is to order the plaintiff's name placed on the ballot.

*Dulles,* 357 U.S. 116, 128–29, 78 S.Ct. 1113, 1119–1120, 2 L.Ed.2d 1204 (1958).

**28.** *Kay v. Austin,* No. 80–1292 (6th Cir., April 30, 1980).

**29.** Michigan Com.L.Ann. § 168.614.

**30.** Also the court seemed to have been persuaded at least in part by evidence that the statute was fairly and impartially applied in practice. Such evidence was not only lacking in the case at bar, but the evidence indicated

discriminatory application of the statute in practice.

**31.** The parties not receiving this relief were held to have been guilty of laches.

**32.** *See Hudler v. Austin,* 419 F.Supp. 1002 (E.D. Mich.1976).

**33.** No candidates other than plaintiff are parties to this action.

The hallmark of a court of equity is its ability to frame its decree to effect a balancing of all the equities and to protect the interests of all affected by it, including the public.[34] That goal is best served here by ordering the plaintiff's name placed on the ballot. An injunction granting this relief is this day entered.

**34.** *See* W. DeFuniak, *Handbook of Modern Equity* § 25 (1956); H. McClintock, *Equity* § 70 (2d Ed. 1948); D. Dobbs, *Remedies* 52–57 (1973).