Lani SOULES; Lafrance Kapaka; Paul Lemkey; Carol Lemkey; Clara G. Rapozo; Alice Souza; Deane B. Abben; Lois A. Birnbaum; Margaret Littman; Masao Mixumo, Registered Voters of the County of Kauai, on behalf of themselves and all other voters of the County of Kauai; Committee to Save Nukolii, Plaintiffs–Appellants,

v.

KAUAIANS FOR NUKOLII CAMPAIGN COMMITTEE; Jerome Y.K. Hew; in his official capacity as Clerk of the County of Kauai; County of Kauai; Kauai County Council, Defendants–Appellees,

and

Graham Beach Partners, et al., Intervenors Defendants–Appellees.

Nos. 85–1906, 86–2233.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 7, 1987.

Decided June 14, 1988.

Sidney Wolinsky, Anita P. Arriola, Public Advocates, Inc., San Francisco, Cal., Robert Harris, Harris & Smith, Honolulu, Hawaii, for plaintiffs-appellants.

Warren C.R. Perry, Second Deputy Co. Atty., Lihue, Hawaii, Henry I. Kuba, Honolulu, Hawaii, for defendants-appellees.

Edward A. Jaffe and Milton M. Yasunaga, Cades, Schutte, Fleming & Wright, Honolulu, Hawaii, Walton D.Y. Hong, Masuoka & Hong, Lihue, Hawaii, Wallace S. Fujiyama and Paul H. Sato, Fujiyama, Duffy & Fujiyama, Honolulu, Hawaii, for intervenors defendants-appellees.

Before POOLE, NORRIS and BRUNETTI, Circuit Judges.

NORRIS, Circuit Judge:

This case involves several constitutional challenges to a special election held on the Hawaiian island of Kauai. We affirm the district court's award of summary judgment rejecting these constitutional claims, but reverse the sanctions imposed on the appellants during the course of the litigation.

I

## BACKGROUND

In 1974, Pacific Standard Life Insurance Company and Graham Beach Partners (the Developers) purchased a 60-acre parcel on Kauai. At the time, the property, known as "Nukolii," was zoned for open or agricultural use only. The County of Kauai (the County) thereafter re-zoned the land for resort use. A coalition of local citizens, the Committee to Save Nukolii (the Committee), organized to oppose the rezoning and to propose an initiative vote to repeal the zoning change.

In January 1980, the County Clerk certified the Committee's petition for an initiative for the November general election. At first, the Committee did not request a special election, but later it requested that the initiative be placed on the ballot for the primary election which was being held 46 days earlier than the general election. In May, the Kauai County Council (the Council) voted against the rescheduling of the

initiative and arranged for its inclusion on the November 1980 general election ballot.

The Committee initiative passed by a 2–1 margin, and the County immediately sued in Hawaii Circuit Court for a declaratory judgment as to the initiative's effect. The trial court held that the County was equitably estopped from enforcing the new zoning law because of its prior approval of building permits. The Hawaii Supreme Court reversed, holding that the Developers were barred from further building under the new law. *County of Kauai v. Pacific Standard Life Ins. Co.*, 65 Haw. 318, 653 P.2d 766 (1982), *appeal dismissed*, 460 U.S. 1077, 103 S.Ct. 1762, 76 L.Ed.2d 338 (1983).

Having lost in court, the pro-development forces shifted the battle back to the political arena. In June or July 1983, a group called Kauaians for Nukolii (KFN) began organizing for the purpose of overturning the 1980 initiative.[1] KFN sponsored a petition drive to have the zoning issue resubmitted as an initiative in a special election. On September 20, 1983, their petition to place an initiative on the ballot was certified by the County Clerk. Thereafter, a new campaign committee, Kauaians for Nukolii Campaign Committee (KFNCC), was formed by KFN to support the initiative. Rather than wait for the general election, KFN offered to pay the County for all the costs incurred in holding the special election.[2] On October 13, 1983, the Council approved a special election on the issue of re-zoning and also "voted to accept a gift of $40,000 from the Kauaians for Nukolii to be placed in the general fund and to make an appropriation of $50,000 from the general fund to finance the special election." Order Granting in Part and Denying in Part Intervenor's and Defendants' Motion for Summary Judgment and Denying Plaintiffs' Motion for Preliminary

Injunction (Final Order) at 3. KFN also pledged an additional $10,000 for election financing in the event of a cost overrun. Substantially all the $50,000 cost of the special election was paid by one of the Developers, Hasegawa Komuten, who evidently was later repaid by other contributors to KFN. *See* Appellees' Brief at 14 n. 8.

The Committee opposed KFN's initiative and responded with its own petition drive for a counter-initiative, the so-called "Fair Choice" initiative, that would require the Developers to put 10% of the revenues from the new projects into a community trust fund. The Committee never collected enough signatures to get the initiative on the ballot.

On November 3, 1983, a public hearing was held on the proposed special election, and on November 17, the special election was approved by the Council. The election date was then set for February 4, 1984. Neither the Committee nor any of its individual members challenged the validity of the special election at this stage. The election took place as scheduled and, although KFN actually lost at the polls, because 82% of the absentee ballots were cast in favor of the initiative, it passed 8,476 to 5,917.

Hawaiian law requires that all special election challenges be filed directly in the state Supreme Court within 20 days of the special election. Haw.Rev.Stat. §§ 11–172, 11–174.5. The Committee and some of its members filed such an action, but the Court dismissed for failure to state a claim. Two months after the election, the Committee and some other members (appellants) filed the instant action in federal district court against the County, County officials, and KFNCC.[3] As later amended, appellants' complaint alleges several claims under 42 U.S.C. § 1983, including that por-

---

1. The parties dispute the extent of the Developers' involvement in the genesis of KFN. *Compare* Appellants' Opening Brief (Appellants' Brief) at 10 *with* Appellees' Brief at 11 n. 5.

2. There appears to be substantial confusion in the record and among the parties as to whether it was KFN or KFNCC that actually made the contribution. *Compare* Appellants' Brief at 11,

Appellees' Brief at 14 & n. 8. As the distinction does not affect our holding, we assume for the purposes of the opinion that KFN was the contributor.

3. The County, the county officials, and KFNCC, together with the Developers, who intervened in the action, constitute the appellees before this court.

tions of the Kauai County Charter is void for vagueness, that the granting of the special election violates equal protection, and that various aspects of the conduct of the election violate due process. As relief the complaint requests (1) declaratory relief (pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201), (2) an order invalidating the election results of the special election, (3) general and special damages for expenditures made in opposing the initiative during the allegedly unconstitutional election, and (4) costs and attorneys' fees. In November 1984, Judge Fong granted appellees' motion for summary judgment in part, holding that equitable relief was barred by laches. In March 1985, he considered the merits of the rest of appellants' claims and granted appellees' motion for summary judgment. In addition, he granted appellees' motion for sanctions against appellants for an allegedly frivolous opposition to the Developers' intervention in the case, 623 F.Supp. 657. The Committee and its members timely appealed. We now affirm in part and reverse in part.

## II

### EQUAL PROTECTION

#### A

#### Standing

■ Appellees contend on appeal that appellants lack standing to claim that the council violated the equal protection clause by authorizing a privately funded special election. According to the appellees, appellants have no standing to press this claim because the appellants have never requested a special election that was denied by the Council for lack of private funding. We disagree.

Essentially, appellees' position is that unless appellants have been denied a special election they have not "suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)).[4] Appellants argue, however, that the Council's decision to finance the special election with private funds was an illegal allocation of political opportunity based on wealth. Appellants claim that this arguably unconstitutional act directly resulted in a legally cognizable injury because their opposition to KFN's initiative in the special election involved extraordinary campaign expenditures that would not have been incurred had the initiative been held over until the general election. We hold that such expenditures constitute a "distinct and palpable injury" and that there is a "'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Envt'l Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) (citations omitted).[5] *Cf. Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 3186, 92 L.Ed.2d 583 (1986) (Treasury employee whose cost-of-living benefit increases were frozen under the Gramm–Rudman–Hollings Act has standing to challenge separation of powers violation); *United States v. SCRAP*, 412 U.S. 669, 687–90, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973) (environmental group has standing to challenge freight rate structure because failure to suspend surcharge would discourage the use of recyclable materials, thus adversely affecting the environment).[6]

---

**4.** Of course actual injury is not the only criterion for standing, *see Valley Forge*, 454 U.S. at 472–75, 102 S.Ct. at 758–60, but it is the only one challenged by appellees.

**5.** Appellees argue that this case is moot based on the premise that no action arising out of the 1980 general election survives because appellants' initiative prevailed at that time. We need not address appellees' mootness argument be-

cause the controversy before us arises out of the 1983 special election, not the 1980 election.

**6.** Because appellants have standing to claim damages from the asserted violation of their right to equal protection, we need not reach the question whether, for purposes of their claim for injunctive relief, they meet the *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983), test of an

## B

### Laches

■ Appellees next argue that regardless of the merits of appellants' equal protection claim, appellants' failure to sue the County prior to the 1983 special election should bar them from now seeking to invalidate that election. As noted above, in November 1984 the district court, ruling on appellees' motion for summary judgment in part, held that appellants' claims for equitable relief were barred by laches. Reviewing this grant of summary judgment de novo, *Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986), we affirm with respect to appellants' equal protection claim.

Although we have the power to invalidate constitutionally infirm elections, *Hadnott v. Amos,* 394 U.S. 358, 367, 89 S.Ct. 1101, 1106, 22 L.Ed.2d 336 (1969), we take into account equitable considerations in fashioning the appropriate remedy in each case. *See Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964). *See generally* Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections,* 49 N.Y.U.L. Rev. 1092 (1974). As the Seventh Circuit has noted, "A federal court reaching into the state political process to invalidate an election necessarily implicates important concerns of federalism and state sovereignty. It should not resort to this intrusive remedy until it has carefully weighed all equitable considerations." *Gjersten v. Board of Election Comm'rs,* 791 F.2d 472, 478 (7th Cir.1986); *see also McMichael v. County of Napa,* 709 F.2d 1268, 1273 (9th Cir.1983) (Kennedy, J., concurring) (invalidation "reserved for instances of willful or severe violations of established constitutional norms"). Indeed, the voiding of a state election is a "drastic if not staggering" remedy. *Bell v. Southwell,* 376 F.2d 659, 662 (5th Cir.1967). Thus, balanced

against the severity of the alleged constitutional infraction, we consider such countervailing equitable factors as the extremely disruptive effect of election invalidation and the havoc it wreaks upon local political continuity.[7]

Moreover, the courts have been wary lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs. As the Fourth Circuit put it, the "failure to require pre-election adjudication would 'permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action.'" *Hendon v. North Carolina State Bd. of Elections,* 710 F.2d 177, 182 (4th Cir.1983) (quoting *Toney v. White,* 488 F.2d 310, 314 (5th Cir.1973)). Therefore, in order to create an appropriate incentive for parties to bring challenges to state election procedures when the defects are most easily cured, we have held that "[t]he law imposes a duty on parties having grievances based on discriminatory practices to bring their complaints forward for preelection adjudication." *Chinese for Affirmative Action v. Leguennec,* 580 F.2d 1006, 1008 (9th Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979). Although adequate explanation for failure to seek preelection relief has been held to exist where, for example, the party challenging the election had no opportunity to seek such relief, *e.g. United States v. City of Cambridge,* 799 F.2d 137, 141–42 (4th Cir.1986), if aggrieved parties, without adequate explanation, do not come forward before the election, they will be barred from the equitable relief of overturning the results of the election. *See, e.g., Hendon v. North Carolina State Bd. of Elections,* 710 F.2d 177, 188–83 (4th Cir.1983); *Hart v.*

---

additional real and immediate threat of future injury. *See Smith v. City of Fontana,* 818 F.2d 1411, 1422 (9th Cir.1987) ("*Lyons* and its progeny do not preclude the exercise of federal jurisdiction when a plaintiff brings both a claim for damages and a related claim for equitable relief in the same lawsuit."); *Giles v. Ackerman,* 746 F.2d 614, 619 (9th Cir.1984).

7. These considerations parallel those of traditional laches analysis: "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961) (citations omitted).

*King,* 470 F.Supp. 1195, 1198 (D.Haw. 1979).

In this case, the district court correctly decided that appellants were barred from invalidation of the special election even if they could make out a constitutional violation. We agree with the district court's assessment that the record in this case contains no genuine issue of material fact on the two questions critical to the application of laches to this case: 1) whether appellants knew the basis of their alleged equal protection claim sufficiently in advance of the election that they had ample opportunity to seek preelection relief; and 2) whether appellants have advanced an adequate explanation for their failure to seek preelection relief.

The record clearly demonstrates that appellants knew of the basis of their alleged equal protection claim well in advance of the special election. The record is replete with evidence of appellants' knowledge of and active opposition to KFN's financing of the special election. On September 29, 1983, the County Policy Committee, comprised of members of the Council, tentatively accepted KFN's tender of $50,000 to cover the costs of the proposed special election. Mr. Turk Tokita, Chairman of KFNCC, and Ms. Lafrance Kapaka–Arboleda, representing the Committee, actively participated in that meeting. Policy Committee Minutes of September 29, 1983, Excerpts of Record (E.R.) 2, Exhibit B:F.[8] Moreover, the Policy Committee's acceptance of the KFN contribution was publicized in the next day's newspapers. E.R. 2, Exhibit A:D, Exhibit A:L.[9] Next, at an October 13, 1983, regular Council meeting the Council itself voted to accept the $50,-000 from KFN. E.R. 2, Exhibit A:F. On November 3, 1983, a public hearing was held on the issue of the proposed election, and on November 17, the bill authorizing the special election and appropriating $50,-000 was approved by the Council. E.R. 2, Exhibit A:J. The record of each of these meetings reflects heated discussions among the Council members on the wisdom of using private funds to finance the election.

The record also shows beyond dispute that, at least as of the November 3 public hearing, the Developers' role in financing the election was clearly a matter of public record. Moreover, the minutes from the very earliest Council or Policy Committee meetings reflect that the Committee was constantly apprised of developments with respect to the proposal for a special election. Given all these facts, we can place no stock in appellants' professed ignorance.[10] Moreover, appellants' assertions that they had trouble discovering the ultimate source of the private funding and its exact amount are legally irrelevant. It was obvious as early as September that private parties were endeavoring to provide from $40,000 to $50,000 to fund a special election. Once the Council voted to accept that money on October 13, there was nothing to keep appellants from suing to enjoin its use to fund the February 4, 1984 special election. Even counting from the November 3 public hearing, the Committee had three full months to file its action. *Compare Smith v. Paris,* 257 F.Supp. 901 (M.D.Ala.1966) (6 weeks notice sufficient to warrant invoking

---

8. E.R. 2 is appellees' answer to the complaint. It contains two attachments: Exhibit "A" is the complaint from the challenge to the special election in the Hawaii Supreme Court; exhibit "B" is the answer in that action. Each of those documents contains several exhibits of its own. Hence, we have adopted a numbering system for references to E.R. 2 in which the first letter following the word "exhibit" indicates the complaint or answer in the Hawaii Supreme Court action and the second letter indicates the respective exhibit attached to the complaint or answer.

9. Like the court below, we consider the newspaper accounts not for the truth of the matters asserted therein, but for the question of notice.

10. Indeed, there is substantial hearsay evidence in the record to the effect that appellants purposefully avoided seeking preelection judicial relief because they hoped to win at the polls first. *See* LeGro, "Save Nukoli'i says ballot is 'misleading,'" Garden Island, December 21, 1983 ("Asked if it wouldn't be better for Save Nukoli'i's public image to try to stop the 'illegal' election from being held instead of taking action afterwards—and then only if the group loses—Wolinsky [appellants' attorney] told The Garden Island 'Our desire is to never get to the legal issue (the legality of the election.)'").

laches), *modified on other grounds*, 386 F.2d 979 (5th Cir.1967).

In sum, the record establishes without dispute that appellants knew the basis for their alleged equal protection challenge well in advance of the proposed special election and that appellants have failed to explain adequately their failure to press this claim before the election. Therefore, we hold that the district court did not err in barring appellants' equal protection claim for equitable relief on the ground of laches.

## C

### Damages

■ Appellants also claim that they are entitled to damages for their expenditure of funds in opposing the allegedly unconstitutional ballot initiative. For much the same reasons that we will not entertain appellants' equal protection claim for equitable relief, we also decline to entertain their equal protection claim for damages. We hold that a Section 1983 damage action is not available in the circumstances of this case.

In *Hutchinson v. Miller*, 797 F.2d 1279 (4th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987), the Fourth Circuit adopted a blanket rule precluding post-election damage actions brought by defeated candidates. In *Hutchinson*, the court refused to entertain a Section 1983 damage action brought by a defeated candidate who alleged that his electoral opponent and various county election officials had conspired to tamper with the vote count. Recognizing the disruption to the democratic process inherent in excessive judicial interference with elections, the court concluded: "[F]ederal courts are not available for awards of damages to defeated candidates.... The legitimacy of democratic politics would be compromised if the results of elections were regularly to be rehashed in federal court.... [W]e refuse to authorize yet another avenue for those disgruntled with the political process to keep the contest alive in the courtroom." *Id.* at 1280.

■ Although, like the Fourth Circuit, we endorse a restrained approach to election challenges, we do not need to adopt a categorical rule to decide this case. We simply hold that a party who is disappointed with the outcome of an election may not recover damages under Section 1983 when that party, with full knowledge of the alleged constitutional infirmity, made no attempt to seek equitable relief to correct that infirmity, but rather without adequate explanation chose to participate in a lengthy and sustained election campaign thereby incurring the damages which it later seeks to recover in a post-election Section 1983 action. As noted above, the appellants knew well in advance of the election that KFN had offered to finance the election and that the Council had accepted this offer. *See supra* at 11–12. Yet rather than pressing their alleged equal protection claim as a basis for enjoining the special election if privately funded, appellants elected to take their chances at the polls. Now, having lost, they sue for damages that were, in a very real sense, self-inflicted.

To permit a Section 1983 damage action under these circumstances—where the claimants have bypassed their potential preelection equitable remedies without adequate explanation—would open the door for "sore losers" to rehash virtually every election campaign in the federal courts long after the election process should have given way to the process of governance. Such a ruling would provide a perverse incentive for every "losing candidate to ignore the principal routes established to challenge an election and to proceed instead to have the election reviewed in federal court in hopes of gaining monetary compensation." *Hutchinson*, 797 F.2d at 1286. For courts to allow disgruntled parties who have sat on their rights to keep a Section 1983 damage action secreted away in case of defeat at the polls would needlessly undermine the finality of election results which in our system ensures the smooth transition from election disputation to stable governance. While we are mindful that federal courts have a duty to ensure that national, state and local elections

conform to constitutional standards, we undertake that duty with a clear-eyed and pragmatic sense of the special dangers of excessive judicial interference with the electoral process. As Judge Rubin wrote for the Fifth Circuit, "If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a Section 1983 gloss." *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir.1980). In this spirit of restraint, we decline to countenance such a "Section 1983 gloss" in the circumstances of this case.[11]

## III

### DUE PROCESS

Appellants also contend that the short time between the setting of the special election and the actual vote as well as various irregularities in the election process "undermined the 'patent and fundamental' fairness" of the election, thereby depriving them of due process of law. Appellants' Brief at 30 (citations omitted). We find that summary judgment was appropriate as to all these claims.

■ First, appellants claim that the timing of the election violated their due process rights. They assert that they had insufficient time to "raise money or to organize," to "comply with the legal requirements to place a counter-referendum on the same ballot in order to provide the electoral [sic] with more than the single issue referendum," or to "conduct a widespread absentee ballot campaign." Appellants' Brief at 35. The district court correctly found this claim meritless. The instant dispute is merely the latest phase in a controversy that had simmered for years. Thus, the record shows that appellants' allegation that they were surprised by the setting of the election is completely incredible.

Next, appellants challenge the constitutionality of Hawaii's absentee voting law, facially and as applied in this case, because the law inadequately protected the secrecy, uniformity and integrity of the absentee voter's franchise. *See* Haw.Rev.Stat. ch. 15. Appellants claim that Hawaii's absentee voting law fails to prohibit "the solicitation, examination and delivery of absentee ballots by persons other than the voters" and that such activities occurred during the special election. Appellants' Brief at 31. The district court held that "chapter 15 of the Hawaii Revised Statutes and the detailed regulations promulgated thereunder provide adequate measures to protect the integrity of the absentee balloting procedure" and that "even drawing all inferences in favor of plaintiffs, the evidence before the court establishes, at most, a few minor irregularities in the voting process and only the mere potential for wrongdoing. Plaintiffs have presented no competent evidence of any actual, much less significant, wrongdoing." March 18, 1985 Order at 15–16, E.R. 66.

■ We agree with the district court that the Hawaii absentee ballot statute and the regulations adopted under it adequately protect the secrecy and integrity of the ballot. Although Hawaii has not adopted a regulation to prevent the delivery of ballots by persons other than the voter, the Hawaii regulations go into great detail in their elaboration of procedures to prevent tampering with the ballots.

■ Moreover, we find no substance to appellants' claims that irregularities in the conduct of the election rendered it fundamentally unfair. It is hornbook law that section 1983 does not provide a right of action for "garden variety election irregularities." *Griffin v. Burns*, 570 F.2d 1065, 1076 (1st Cir.1978). *See also Curry v. Baker*, 802 F.2d 1302, 1314–17 (11th Cir. 1986); *Hutchinson v. Miller*, 797 F.2d

---

11. We also decline to consider appellants' claim for declaratory relief. In the absence of any threat that Hawaii will hold another privately financed special election, we will not issue what would be an essentially advisory opinion on the important constitutional question raised in this case.

1279, 1283 (4th Cir.1986); *Bodine v. Elkhart County Election Board*, 788 F.2d 1270, 1271–73 (7th Cir.1986); *Gamza v. Aguirre*, 619 F.2d 449, 453–54 (5th Cir. 1980); *Pettengill v. Putnam County R–1 School Dist.*, 472 F.2d 121 (8th Cir.1973). Only a pervasive error which undermines the "organic processes" of the ballot is sufficient to trigger constitutional scrutiny. *See Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir.1975). The few concrete examples of alleged irregularities that we can cull from appellants' generally conclusory allegations, including claims of lax security and the delivery of 60 absentee ballots by persons other than the voter, do not bring into question the fundamental fairness of the conduct of the special election. Indeed, in this regard the Kauai special election was no different than most elections. "Elections are, regrettably, not always free from error. Voting machines malfunction, registrars fail to follow instructions, absentee ballots are improperly administered, poll workers become over-zealous, and defeated candidates are, perhaps understandably, inclined to view these multifarious opportunities for human error in a less than charitable light." *Hutchinson*, 797 F.2d at 1286–87. Nonetheless, "[w]ere we to embrace plaintiffs' theory, this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, election cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law." *Powell v. Power*, 436 F.2d 84, 86 (2d Cir.1970). This we will not do. The federal courts are not "the arbiter[s] of disputes over ... alleged irregularities in the transmission and handling of absentee voter ballots." *Pettengill*, 472 F.2d at 122. Thus, we affirm the district court's grant of summary judgment with respect to appellants' due process claim.

## IV

### VOID FOR VAGUENESS CHALLENGE

■ Appellants contend that the Kauai County Charter section granting the Council unbounded discretion to schedule special elections in "appropriate circumstances" is "void for vagueness" and violates appellants' rights to due process, to freedom of expression and to vote.[12] *See* Kauai County Charter, Article V, § 5.07(C).[13] We disagree.

"A statute is fatally vague only when it exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct." *Rowan v. United States Post Office Dept.*, 397 U.S. 728, 740, 90 S.Ct. 1484, 1492, 25 L.Ed.2d 736 (1970). Appellants are not at risk of being punished for engaging in ill-defined proscribed conduct. Rather they are subject to the Council's determination of when it is appropriate to have a special election. The Council, as the local legislative body, exercises this authority pursuant to the County Charter, which has been adopted under the Hawaiian Constitution as the "organic law" for the self-governance of the County. *Hawaii Gov't Employees' Ass'n. v. County of Maui*, 576 P.2d 1029, 1034–38 (1978). As the district court explained, "the Kauai County Charter can best be characterized as the constitution of the County." March 18, 1985 Order at 6, E.R. 66. Thus, section 5.07(c) of the Kauai County Charter merely allocates to the Council the power to authorize special elections. The void for vagueness doctrine does not apply to this fundamental delegation of authority to the legislative body.[14]

---

12. Appellants also argued below that the charter provision constitutes an unconstitutional delegation of legislative authority to the County Council. They do not pursue this argument on appeal.

13. Section 5.07(C) provides in full: "The council may, in its discretion, and under appropriate circumstances, provide for a special election."

14. We find inapposite appellants' citation to *Kay v. Mills*, 490 F.Supp. 844 (E.D.Ky 1980). That case dealt not with the fundamental allocation of power to a local legislative body, but rather with a statute which delegated to an administrative board the arbitrary power to select the names to be placed on a presidential primary ballot. *Id.* at 849–54.

## V

## SANCTIONS

█ Appellants also challenge the district court's award of sanctions against them under Fed.R.Civ.P. 11, 28 U.S.C. § 1927, and under the court's inherent equitable powers. We reverse that award.

As noted above, appellants first attempted to overturn the special initiative election by suing in state court for violations of state election law. The Developers attempted to intervene in that action, and the Committee opposed the intervention. The Hawaii Supreme Court dismissed the case without deciding the intervention motion.

When the Committee and its members later filed the instant suit, the Developers again moved to intervene, this time requesting an expedited hearing. The Developers attached a copy of the Committee's state court opposition memorandum as an exhibit to their motion. Appellants refused to stipulate to intervention, resisted the expedited hearing, and orally requested an extension of time to file an opposition. The magistrate refused the requested extension of time and ordered an expedited hearing at which appellants presented their position orally. At the hearing, appellants' counsel stated, "We rely primarily on the same arguments which are contained in our memorandum of points and authorities in opposition to the motion to intervene which was filed in state court." Order Accepting Magistrate's Report and Recommendations re: Intervenor's Motion for Sanctions, March 25, 1986, E.R. 86 (March 25 Order).

The magistrate granted the Developers' motion to intervene and, labelling appellants' opposition to intervention frivolous and vexatious, awarded sanctions against appellants under Rule 11 on the basis of their state court papers orally incorporated by reference during the expedited hearing. The district court upheld the award. We review de novo the district court's legal conclusion that a given set of facts constitutes a violation of Rule 11. *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 828 (9th Cir.1986).

Rule 11 requires that parties or their attorneys sign papers filed in federal court as a certification that the arguments contained therein are based on reasonable interpretations of the law and are not interposed for an improper purpose. In this case, the district court awarded Rule 11 sanctions against appellants on the basis of their state court opposition papers even though appellants never filed those papers in the federal action. Apparently the district court felt unconstrained by Rule 11's signed certification requirement because, in the court's view, "[o]nly the fact of the expedited hearing prevented [plaintiffs] from turning out a fresh copy of the state court memorandum in opposition, with merely the caption altered. That plaintiffs would have done so, had they been given the time, appears indisputable." We disagree. Whether the appellants would have modified their legal arguments had their request for an extension of time to file a brief been granted is purely a matter of conjecture. A district court cannot award Rule 11 sanctions on the basis of its speculation that a party would have filed certain papers had that party been given the opportunity.

The district court also relied on 28 U.S.C. § 1927 and on its inherent equitable powers as alternative grounds for the award of sanctions. We review the award of Section 1927 sanctions for abuse of discretion. *Estate of Blas v. Winkler,* 792 F.2d 858, 860 (9th Cir.1986).

A prerequisite to the imposition of Section 1927 sanctions is that the attorney's conduct be in bad faith.[15] *See Estate of Blas,* 792 F.2d at 860; *Zaldivar,* 780 F.2d at 831. "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an

---

**15.** Section 1927 provides in full: "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

opponent." *Estate of Blas,* 792 F.2d at 860 (citations omitted).

The only mention of bad faith in the district court's order appears in the discussion of whether appellants' opposition was frivolous or vexatious under Rule 11. The court noted that it "might agree that plaintiffs have not been shown to have acted in subjective bad faith...." March 25 Order at 8, E.R. 86. We cannot treat this conditional observation as a finding of bad faith.[16] Thus, we hold that the district court abused its discretion in granting sanctions against appellants under section 1927 and its equitable powers.

## CONCLUSION

We hold that appellants' equal protection claim to injunctive relief is barred by laches, and we will not entertain their equal protection claim to damages in the particular circumstances of this case. We further hold that appellants' due process claims raise nothing more than objections to "garden variety irregularities" in the election proceedings and that the County Charter is not void for vagueness. We therefore affirm the district court on these claims. The district court's order imposing sanctions is reversed.

AFFIRMED IN PART AND RE-VERSED IN PART.

---

**16.** With respect to an award of fees pursuant to the court's equitable powers, appellees have argued only that fees may be awarded when a party acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973) (quoting 6 J. Moore, Federal Practice ¶ 54.77[2], p. 1709 (2d ed. 1972)). Thus, we reject the equitable justification for the fee award for the same reasons that we reject the award under section 1927.